ON APPLICATION FOR REHEARING
This Court's original opinion is withdrawn and the following opinion is substituted therefor.
This appeal is from a summary judgment for the defendant in a personal injury action arising out of an automobile accident. At issue is the validity of a release that the plaintiffs claim they were fraudulently induced to sign. *Page 537 
Summary judgment is appropriate only if the materials submitted to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Ala.R.Civ.P. "The court must view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the non-moving party." Sanders v. White, 476 So.2d 84, 85 (Ala. 1985).
The materials submitted on the summary judgment motion, particularly the plaintiffs' depositions, would support a finding of the following facts. On November 19, 1985, Martha Heath Taylor was injured in a collision between the automobile she was driving and one operated by William Franklin Dorough. Mrs. Taylor suffered injuries to her back and her face that required hospitalization. Soon after the accident, Ken Bernard, as agent for Dorough's insurer, wrote a letter to Mrs. Taylor and her husband, Loyd Bedford Taylor, asking them to communicate with him concerning the accident. Mr. Taylor telephoned Bernard and discussed the property damage to the Taylors' automobile. The Taylors' car was a total loss, and Bernard agreed to pay the full value for it. Only Mr. Taylor was involved in this transaction, because the title to the car was in his name. Mr. Taylor stated that, during these negotiations, he told Bernard that the Taylors had retained an attorney regarding the accident. Bernard wrote two checks, one paying off the note due on the car and the other paying Taylor his equity.
The hospital discharged Mrs. Taylor without payment of her bill and sent her collection letters thereafter. The hospital apparently brought an action against the Taylors and obtained a lien on their house to secure the debt. The Taylors stated that Bernard told them that they would have to "sign some papers" in order for Dorough's insurer to pay the hospital and medical bills. The Taylors went to Bernard's office, with Mrs. Taylor going in first while Mr. Taylor parked the car. Mrs. Taylor endorsed a check for $2,534.25, made payable jointly to the Taylors and the hospital, and Bernard told her he would send the check to the hospital. Bernard also gave her a check for $2,965.75 made out to the Taylors, and she endorsed it while in his office. Both checks contained language purporting to release the Taylors' claims against Dorough. Mrs. Taylor stated in her deposition, however, that Bernard presented the checks to her face down for endorsement and that she did not see the release language.
Mrs. Taylor also signed a document styled "Release In Full of All Claims." In her deposition, she stated that Bernard presented the document to her with the entire page covered except for the signature lines, evaded her questions about the document, and told her that she had to sign it for the checks to be released. Mr. Taylor came into the office after his wife had signed and, he said, simply added his signature under hers on the checks and the release. Bernard did not give the Taylors a copy of the release. When the Taylors left Bernard's office, they went immediately to their bank and deposited the check made out to them. They used that money to pay accumulated medical bills. They both stated that they did not read the release language on the front of the check.
The Taylors later sued Dorough, whereupon Dorough interposed the release in support of his motion for summary judgment. The Taylors responded that they had been fraudulently induced to sign the release, but the trial court granted summary judgment. Mr. Taylor has not appealed from the judgment, so it is final as to his claim for loss of consortium.
Mrs. Taylor's affidavit recites this version of the facts:
 "I received physical injuries and was hospitalized at Carraway Methodist Hospital. Shortly after I was discharged, I began receiving collection letters from Carraway and was also told I would not be readmitted to the Hospital for plastic surgery that I will need for my face unless the hospital bills were taken care of immediately. Also, I owed money to the physicians who had treated me. *Page 538 
 "On February 3, 1986, my husband and I went to the office of [Bernard]. The purpose of this meeting was to make arrangements for payment of the medical bills my husband and I had incurred for my treatment. Mr. Bernard represented to me that the two checks which totaled Five Thousand Five Hundred and no/100 Dollars ($5,500.00) were for payment of my medical bills only. In fact, he stated 'what are we going to do about the liability aspect of this case.' I replied, 'I have a lawyer and I'm not going to let you put the screws to me.'
 "In addition to the checks my husband and I signed, we were told by Mr. Bernard to sign a release so that he could release the check we had signed, which was also payable to Carraway Methodist Hospital. At no time was it represented to me that the release that he told me I had to sign was a release of all my claims. In fact, the entire release was covered up except for the area where we were to sign our names. Mr. Bernard had already put x's by the lines that we were to sign. I was in pain and on medication on the day of the meeting and was anxious to get out of Mr. Bernard's office as soon as possible. In fact, the whole meeting did not last more than a few minutes.
 "I received a broken back and a broken mandible, among other injuries, as a result of the automobile accident that occurred during November of 1985. I have been told by my physicians that the plastic surgery I will need for my face will cost several more thousands of dollars. I would never agree to settle this case for Five Thousand Five Hundred and no/100 Dollars ($5,500.00) with the type of injuries I have received. My husband and I were misled into signing the release and were completely shocked to learn that it was a release of all my claims for the injuries I received."
Mrs. Taylor's deposition alleges the following facts pertinent to the Taylors' claim that they were fraudulently induced to sign the release:
 "Q. Did you tell Employers [National Insurance Company, Dorough's insurer] that you had an attorney?
"A. Yes, ma'am.
 "Q. When did you tell Employers you had an attorney?
 "A. I told Mr. Bernard that I had an attorney when I went up and signed the check for Carraway.
"Q. When was that?
"A. February 4th.
 "Q. Did you tell Mr. Bernard who your attorney was?
 "A. I asked Mr. Bernard was this the liability part of my insurance and that he wasn't going to put the screws to me about it. He said, no, that was the medical bills. That's why I assumed I had signed for my medical bills to be paid.
"Q. Tell me exactly what you said to Mr. Bernard.
 "A. I told him that this was not the liability — I asked him if this was the liability part of my insurance. The answer was, no, this was medical bills. I said you are not going to put the screws to me, are you? And then Mr. Bernard said I need to sign this paper and sign that check so he could pay the bill. That's what I done.
". . . .
 "A. I didn't see the check that was made out to Carraway. I was told to sign the check and that's what I signed.
"Q. You did not see the front of the check at all?
 "A. I signed the back of the check on the back where it says endorsee [sic] right there.
"Q. Did you ask to see the front of the check?
"A. No ma'am.
". . . .
 "Q. Is this the release or a copy of the release that you signed in Mr. Bernard's office on February 4, 1986?
 "A. I can't say if that's the release I signed because it was covered up.
"Q. How was it covered up?
"A. Sort of like this (indicating).
"Q. Did you ask to read the release? *Page 539 
"A. No, ma'am.
"Q. Did you know what you were signing?
 "A. I was told that I needed to sign this paper so Carraway Medical Center could be paid, and that's what I signed.
"Q. Did you know you were signing a release?
"A. No, ma'am.
". . . .
"Q. Did you receive a copy of this release?
"A. No, ma'am."
Mr. Taylor's deposition was consistent with his wife's; for example:
"Q. What did you say to Mr. Bernard?
 "A. I asked him had the medical bills been paid, and at that time he told me that he didn't have all the medical bills and that he had to get a release signed so he could get a copy of the medical bills.
"Q. What happened next? Did he get a release?
"A. I don't know whether he did or not.
". . . .
 "Q. When is the next time you had occasion to talk with Mr. Bernard?
 "A. I believe it was about the time that the sheriff brought that thing out from St. Clair County.
"Q. That's the Carraway Methodist lien?
"A. Yes, ma'am.
". . . .
"Q. What did you say to him?
 "A. I told him I thought the hospital bill was going to be taken care of. That's what he had told me.
"Q. What did he say?
 "A. He told me that he could not take care of the hospital bills until me and my wife come in there and signed some papers and then they would be took care of. "Q. What kind of papers?
 "A. Just a release paper saying that we released the — you had the paper there. Here you go. This paper here.
 "Q. So, over the telephone you discussed signing a release of all claims?
 "A. No, not discuss releasing all claims. He said we had to sign this paper so he could pay the medical bills.
"Q. Tell me exactly what he said if you recall.
 "A. He said he could pay the medical bills but first we would have to sign papers before he could pay them.
 "Q. Did he tell you what kind of papers you had to sign?
"A. No, ma'am.
". . . .
 "Q. Did you ever tell Mr. Bernard that you wanted seventy-five hundred dollars to settle this case?
"A. No, ma'am, not at all.
 "Q. Did you ever give Mr. Bernard any amount that you wanted to settle?
"A. No, ma'am, none whatsoever.
 "Q. Did you agree with Mr. Bernard on the figure of five thousand five hundred dollars?
"A. No, ma'am, I did not.
"Q. Where did that figure come from?
"A. I don't know.
". . . .
 "Q. When you contacted Mr. Bernard about arranging a meeting, what exactly did Mr. Bernard say to you?
 "A. He told me to come on down to his office, and I believe it was 5:00 or 5:30 or something like that. I don't know exactly. It was pretty late. . . .
". . . .
 "Q. Did your wife go in Mr. Bernard's office before you did?
 "A. What I did was I pulled up in front of his office, and my wife got out because it was cold. I parked the car and then when I got up to Mr. Bernard's office, my wife was coming out.
"Q. Did she tell you what she had signed?
"A. No, she didn't.
"Q. Did she tell you what happened in his office?
"A. No, none whatsoever.
"Q. Why did you go on in to his office?
 "A. She said Mr. Bernard is in there and you will have to sign those papers. I *Page 540 
walked in and he said sign here and sign this check right here.
"Q. Did you know what papers you were to sign?
 "A. No, ma'am, I didn't. I wasn't paying attention. I was just in a hurry.
". . . .
"A. I didn't see the check. All I did was sign it.
"Q. Did you ask to see the check?
"A. No, ma'am, I did not.
"Q. Did you know what you were signing?
 "A. I was signing a check to pay Carraway Hospital.
". . . .
 "Q. The check you received from Employers National did you read on the front of the check that it was a release in full of all claims against William Dorough arising out of an accident at or near Wilsonville, Alabama on or about 11/1985?
"A. No, ma'am, I did not.
". . . .
 "Q. Did you read the [release] before you signed it?
"A. No, ma'am.
". . . .
 "Q. During all your conversations with Mr. Bernard did you ever tell Mr. Bernard that you and your wife were talking to an attorney?
"A. Yes, ma'am, he knew we had an attorney.
"Q. How do you know he knew you had an attorney?
 "A. When I was at GMAC I told him that we settled on the car, that my attorney would take care of her part of it.
". . . .
 "Q. When you were talking with Mr. Bernard, did you use the language that you were going to settle the claims or make settlement?
"A. No, ma'am, none whatsoever.
"Q. You never discussed an amount?
"A. No, ma'am.
". . . .
 "A. Well, over the telephone we talked and he said that he would pay the hospital if I come down to sign it. I would have to come down to his office. There was no way around that and sign the paper. It was just for the medical bills. He said that he would give me a check to pay the medical bills with and he would pay Carraway Hospital."
Thus, the Taylors' deposition testimony presents evidence that Bernard told them that they would have to sign some unidentified papers before Dorough's insurer could pay the hospital and medical bills. To the extent that he identified the paper, the Taylors say, he told them that it was an authorization for the doctors or the hospital to release medical records. Mrs. Taylor's evidence could support a finding that he actively concealed the language of the release when he obtained her signature; certainly, the Taylors' testimony is unequivocal that Bernard never explained the effect of their signatures on the release and the checks. Bernard had 20 years' experience as an insurance agent or adjuster, the Taylors were relatively unsophisticated and in desperate need, and Bernard worked with them rather than their lawyer even though, according to the Taylors, they had told him on at least two occasions that they had a lawyer.
A release obtained by fraud is void.
 "It is unnecessary to refer to authorities to show, that if a release of a right is obtained by fraud, the release is void; for fraud will vitiate all instruments, however formal, or solemn in their character."
Turnipseed v. McMath, 13 Ala. 44, 48 (1848); Edmondson v.Dressman, 469 So.2d 571 (Ala. 1985). Generally, a party must return the consideration given for a release as a condition precedent to challenging the release as having been fraudulently obtained. Edmondson, supra; Birmingham Railway,Light Power Co. v. Jordan, 170 Ala. 530, 54 So. 280 (1910). The rule that a party may not disaffirm a voidable contract and at the same time enjoy the benefits thereunder is "not absolute," however, but "must be applied to *Page 541 
comport with general equitable principles." Alabama Football,Inc. v. Stabler, 294 Ala. 551, 319 So.2d 678 (1975) (citations omitted).
 "While generally a party rescinding a contract for fraud is under a duty to restore the benefits received under the contract before he can rescind, he does not have to do so where the consideration received is without value, or where it is impossible, impractical, or futile to restore the consideration."
Stanard Tilton Milling Co. v. Mixon, 243 Ala. 309, 9 So.2d 911
(1942) (citations omitted). The materials submitted in opposition to the summary judgment motion in this case indicate that it would be impossible for the Taylors to return the money, because they used it to pay Mrs. Taylor's medical providers, who were threatening to foreclose a lien on the Taylors' house. Under the circumstances of this case, a tender of the amount paid to them, allegedly represented as being only a partial payment on this claim, was not a condition precedent to their maintaining this action. Cf. Gilbert v. Wilson,237 Ala. 645, 188 So. 260 (1939).
Nor does the fact that they did not read the release or the checks necessarily defeat their attempt to avoid the release, in light of Bernard's alleged misrepresentations and sharp dealing.
 "The fraudulent misrepresentation of the contents of an instrument by a party thereto, or by his agent taking the instrument, affords grounds to avoid the instrument's effect notwithstanding the signator neglected to read the instrument."
Illinois Cent. R.R. v. Johnston, 205 Ala. 1, 5, 87 So. 866, 869
(1920), cert. denied, 254 U.S. 654, 41 S.Ct. 218, 65 L.Ed. 459
(1921), writ of error dismissed, 255 U.S. 564, 41 S.Ct. 375,65 L.Ed. 788 (1921).
 "[I]n this case there is evidence that defendant's attorney not only told plaintiff on his first visit, in the negotiations, that he would 'give him enough until he went back to work, and then make a settlement,' and that the amount agreed on 'wasn't said as a settlement' (besides much other evidence of the same general nature), but that when he returned the next day, with the release, and when it was signed and the money paid, he said to plaintiff, 'Here is a showing I want you and your wife to sign showing you got the money.' Plaintiff as a witness repeated this in substance several times, and in one place he expressed it as follows: 'He said it was a receipt showing Mr. Agee that we got the hundred dollars.' It was not read to him, and he did not ask for it to be read, and he was in his right mind, but he had the right to rely on a statement to him as to what it was. It was in fact much more than a 'receipt' or 'showing' that he had received $100. According to the evidence of plaintiff, this was agreed to be only compensation for certain items of his damages, but not for a settlement. Taking it all together, we think that it tends to show that there was evidence which should be treated as descriptive of the nature of the instrument plaintiff signed, different from what it was in fact. We repeat that the rule is, if there is any evidence to that effect, its weight should be submitted to the jury. The lack of evidence pointed out in the Garner Case, [Central of Georgia Ry. v. Garner, 219 Ala. 441, 122 So. 429 (1929)], was thus supplied in this."
Cooper v. Agee, 222 Ala. 334, 338, 132 So. 173, 176 (1930), overruled on other grounds, Simpson v. Glenn, 264 Ala. 519,88 So.2d 326 (1956).
If a release is obtained from one in a weak condition, without advisers, for a sum grossly less than would be a fair and just compensation, a jury question of fraudulent inducement is presented. Louisville Nashville R.R. v. Huffstutler,162 Ala. 619, 50 So. 146 (1909). There was evidence that Bernard knew that the Taylors were in desperate need — that he knew about the lien on their house, the collection letters from the various health care providers, and the need for further medical care. Mr. Taylor testified that the two checks did not cover even the bills already accrued. Mrs. Taylor had had her jaw wired shut until earlier in the day when she signed the *Page 542 
release, and she was on medication and in pain while she was in Bernard's office. The Taylors allege that Bernard knew that they had employed a lawyer, but that he nevertheless dealt directly with them in obtaining the release. Such conduct by an experienced insurance agent strongly supports an inference of fraud.
Under the principles and the evidence cited above, the trial court erred in entering summary judgment for Dorough. The judgment is therefore reversed and the cause is remanded.
APPLICATION OVERRULED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, SHORES, ADAMS and KENNEDY, JJ., concur.
MADDOX, HOUSTON and STEAGALL, JJ., dissent.