[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 573 
This appeal arises from a suit based on alleged fraud and interference with business relations filed by Leon and Mary Sue Strahan against Haden and Mary Tidmore and Valley Properties, Inc. A jury awarded the Strahans a total of $75,000 and denied relief to the Tidmores on their counter-claims for damages for breach of contract and for ejectment. The trial court entered judgment on those verdicts.
In 1986 the Strahans were operating a restaurant known as Val Monte Steak House on property they possessed under a lease with an option to purchase. The property was owned and leased by Vickie Robbins[1] and was subject to a mortgage held by the Tidmores.
In 1986, after some discussion and negotiation, the Tidmores offered to advance the Strahans funds to be used to complete improvements that they had begun on the property. The Tidmores entered into an agreement dated March 16, 1986, to lend the Strahans $30,000. In consideration for this loan, the Tidmores were to receive 2 1/2% of the gross receipts from the Steak House business until the loan was repaid. The Strahans initially made some of these payments but thereafter ceased making payments.
On September 23, 1986, the parties entered into a second agreement under which the Tidmores lent the Strahans an additional $10,000. This second agreement required the Strahans to make the 2 1/2% payments still due under the March agreement and to continue to pay the Tidmores 2 1/2% of the gross receipts. The Strahans failed to make any of these payments following the execution of the September agreement.
Apparently because of problems between Robbins and the Tidmores, the Tidmores began foreclosure proceedings on their mortgage on the property. In January 1987, the Tidmores and the Strahans began discussing a plan by which the Tidmores would purchase the property from Robbins and lease it to the Strahans. The Tidmores proposed to the Strahans a lease with an option to purchase that was very similar to the Robbins lease. The proposed lease included an attachment, referred to by the parties and herein as "Exhibit B," adding a long list of conditions not present in the Strahans' lease with Robbins. Exhibit B would have given the Tidmores extensive power over the daily operation of the Steak House and specified the accounting and business practices in detail. For example, paragraph 12 directed the Strahans to provide the Tidmores, or their agent, a set of keys to the entire property, including the office, with complete access to all of the records. The Strahans contend that they never agreed to the inclusion of Exhibit B in the lease.
On January 30, 1987, the parties met in the office of Ralph Smith, the Tidmores' lawyer, and executed a lease/purchase *Page 574 
agreement. This agreement established a purchase price, gave credit to the Strahans for payments they had made to Robbins, and added the principal and interest on the funds that the Tidmores had advanced in 1986. Although it is undisputed that all the parties signed the agreement, there is considerable disagreement between the Tidmores and the Strahans as to whether Exhibit B was part of the executed lease/purchase agreement.
The Tidmores claim that the Strahans were given a copy of Exhibit B, prior to the meeting, and were advised to consult their lawyer. The Tidmores, Smith, and Smith's legal secretary, Deborah Pinson, all assert that the Strahans agreed to the inclusion of Exhibit B, that Exhibit B was present in the office with all of the other lease documents, and that it was later stapled to the executed lease that the Strahans signed. According to Smith, a reference to its inclusion was added in the main body of the lease at Paragraph 33.
Leon Strahan, in contrast, claims that Exhibit B was not attached to the copies that he and his wife signed and was not attached to the copy that they were given to take home. Strahan maintains that the Tidmores assured him that the provisions in Exhibit B would not be a part of the executed lease. He testified that he received a letter from Haden Tidmore, dated January 24, 1987, stating that "we will follow our two previous agreements." The January 24 letter states that the new agreement deleted several provisions previously required and would save the Strahans more money. For example, the letter states in part:
 "[The agreement] does not require, among other things, the following:
 "(1) the original $13,000.00 earnest money payment.
"(2) Monthly payment reduced by $500.00.
 "(3) Instead of getting credit for less than half of your monthly payment, you will be getting 100 percent of your monthly payment credited as outlined in this agreement."
Following the execution of the lease/purchase agreement on January 30, the Strahans did not comply with the provisions of Exhibit B, nor did they submit payments of 2 1/2% of the gross receipts as directed by the March 16 and September 23 agreements.
On February 21, 1987, the Tidmores received title to the property from Robbins. On that same day the Tidmores, through Smith, informed the Strahans that they were the new owners of the property. Smith's letter emphasized that Exhibit B was a part of the January 30 agreement and that any term or condition in Exhibit B that was not satisfied should be fulfilled immediately. The Strahans assert that it was only after they received this letter that they discovered the reference to Exhibit B in paragraph 33 of the lease, and, further, that this was their first notice that the Tidmores intended to enforce the conditions of Exhibit B. The Tidmores claim that, following this initial letter, they gave the Strahans timely notice to cure the default in regard to the conditions detailed in Exhibit B.
On March 10, 1987 — 17 days after they received title to the property — the Tidmores executed a lease/purchase agreement for the property with Robert and Betty Bains from Georgia. This new agreement provided that the Bainses would pay the Tidmores $550,000 versus the original $310,000 that the Strahans had agreed to pay.
The Strahans insist that, following the agreement with the Bainses, the Tidmores began attempts to evict them from the property and they allege that the Tidmores were motivated by the lucrative offer from the Bainses. They charge that various inspectors, including the county health inspector, the fire marshal, and the city building inspector, came to the property at the insistence of the Tidmores. They also allege that the Tidmores hired off-duty policemen and deputies to watch the premises during and after business hours, and that the Tidmores tried to create problems by attempting to hire their employees and by *Page 575 
telling their employees "they were taking over" the business.
The Strahans filed an action in the circuit court against the Tidmores and Valley Properties, a corporation owned principally by the Tidmores and through which they purchased and leased the property, alleging fraud and interference with business and demanding compensatory and punitive damages. The Tidmores and Valley Properties counterclaimed, alleging a breach of the March 16 loan agreement, the September 23 loan agreement, and the January 30 lease/purchase agreement, and seeking damages for fraud. The Strahans amended their original complaint and added a count alleging breach of the January 30 lease and seeking specific performance of the purchase option contained in that lease.
During this same time, the Tidmores and Valley Properties filed an action for eviction against the Strahans in the District Court of Marshall County, Alabama. The district court entered a judgment in favor of Valley Properties, awarding it possession of the property. The Strahans appealed that judgment to the circuit court.
The Tidmores and Valley Properties filed a motion to consolidate the Strahans' appeal from the judgment of eviction with the Strahans' action against the Tidmores and Valley Properties, and the circuit court granted that motion.
The jury returned the following verdicts:
 • $25,000 in favor of the Strahans, and against the Tidmores and Valley Properties, on the claim for interference with business relations.
 • $50,000 in favor of the Strahans and against the Tidmores and Valley Properties on the fraud claim.
 • For the Strahans on the Tidmores' and Valley Properties' counterclaim alleging fraud.
 • For the Strahans on the Tidmores' and Valley Properties' claims alleging breach of contract and seeking possession of the property.
The Tidmores and Valley Properties filed a motion for judgment notwithstanding the verdict, or alternatively, for a new trial. The Strahans filed an amended complaint asking the court to order the Tidmores to specifically perform their obligation to sell pursuant to the option to purchase contained in the lease and asking the court to establish the rights of the parties in regard to the option to purchase and to establish the purchase price of the property. The trial court denied the Tidmores' and Valley Properties' motions and the Strahans' claim for specific performance and declaratory relief. The Tidmores and Valley Properties appeal from the judgments in favor of the Strahans based on those verdicts.
The Tidmores argue six issues in their appeal to this Court. First, they assert that the verdict in favor of the Strahans on the fraud claim should be set aside because, they say, it is inconsistent with the jury finding that the Tidmores were not entitled to damages for breach of contract. The Strahans' fraud claim was based on alleged misrepresentations made by the Tidmores concerning the inclusion of Exhibit B in the January 30 agreement. The Tidmores argue that in order for the jury to return a verdict for the Strahans on that claim, it had to have found that Exhibit B was a part of the lease and that, under such a finding, the Tidmores were entitled to receive the 2 1/2% of the Steak House gross receipts as specified in Exhibit B. The Tidmores also tender the proposition that the Strahans are arguing "attempted fraud," which the Tidmores argue is insufficient to support a claim of fraud because of the lack of reliance by the party on whom the fraud is attempted.
The Strahans counter with the argument that it was not necessary for the jury to find that Exhibit B was effectively included in the agreement for them to prevail on the fraud claim, but, rather, that the Tidmores' representations that Exhibit B would not be included in the lease and, thus, that they would not attempt to enforce it, together with their later oppressive attempts to enforce Exhibit B, provided a basis for the fraud verdict. The Strahans assert that there is no inconsistency in the verdict and *Page 576 
cite Ala. Code 1975, § 6-5-103,[2] and the trial court's charge to the jury to support their argument that the jury could have found fraud in the Tidmores' taking the position that Exhibit B was part of the agreement after having promised that it would not be. Section 6-5-103 states:
 "Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood."
The pertinent portion of the trial court's charge to the jury on the issue of fraud reads:
 "[The plaintiffs state] that Schedule B wasn't a part of [the lease] — they entered into it on that basis, and that by deceit and fraud it was made a part of it or attempted — a better statement would be attempted to be made a part of it, because whether it is a part of it is going to be for you to decide in some other situations later on — and that they relied upon the conduct of the defendants and that they were damaged because of it." (Emphasis added).
In order for a promise to constitute "fraudulent misrepresentation" there must have been an intent not to do the act promised, and such a promise must have been given with the intent to deceive. Army Aviation Center Federal Credit Union v.Poston, 460 So.2d 139 (Ala. 1984). Fraud in the legal sense is misrepresentation of a material fact of such a nature that would induce an injured party to take action. Reeves v. Porter,521 So.2d 963 (Ala. 1988). The Strahans argue that there was substantial evidence presented to support their fraud claim. First, they insist that the Tidmores fraudulently induced them to sign a lease in which they had deceptively attempted to include the provisions of Exhibit B while, at the same time, representing that Exhibit B was not part of the agreement and would not be enforced. Second, they contend that the Tidmores ventured to enforce these provisions and that, because of the Tidmores' actions, they suffered both injury to their business and personal injury. In support of their contentions, Mrs. Strahan testified to the following:
 "Q. If you would, tell the jury what happened on that occasion, what you saw and what you heard when you said [the Tidmores] came in and took inventory.
 "A. Well, this was a day — we'd just been open for lunch — about twenty minutes after eleven — the dining room was full of people. We had Continental Grain in the back area; they were having some kind of big meeting back there, and the Tidmores come in with Joan, which used to be our bookkeeper, and I believe there was four deputy sheriffs come in demanding to open the books and they came in with Mr. Bains, and they started taking inventory of everything in the restaurant, with the dining room full of people not knowing what's going on, and actually they were embarrassed for us 'cause they're good customers. That's —
 "Q. Did any of the customers leave after the Tidmores —
 "A. The Continental Grain people in the back got up and left because they were back there, and I asked Joan — I said — I just asked her what are you doing, and he said shut up, this is a court order and you can't interfere, and then the man from Continental Grain look[ed] at him and he says come on, let's go, and it was a year before we even got them to come back.
 "Q. Now, this was after the Tidmores had begun the ejection suit; is that correct?
"A. Yes, sir.
 "Q. After you and Mr. Strahan signed the agreement in January of '87, did you *Page 577 
notice any change in the volume of business you were doing at Val Monte?
 "A. Well, at that time, Mr. Hanson, we were having a lot of rebuttal among the employees. The Tidmores had been talking to them, wanting 'em — if they — when they took over they was wanting 'em to stay, offering 'em more money. The employees didn't know what was going on. The rumors around town they were gonna take it away from us. The jobbers or the people — salesmen, they were leery of letting us have — everything had to be paid in cash, and people calling, are you open, I heard you closed down, and —
"Q. Did these facts —
"A. — and the sales, yes, they did drop.
 "Q. Did that create any problems for your employees?
 "A. Well, we had a lot of employees to quit; the employees didn't — they didn't know whether they had a job the next day or what was gonna — yes, it did. And right now, as this trial right here, there's — there's problems at work because the vibes is there; they don't know whether they've got a job, they don't know what's going on. Yes, it does — it did interfere with 'em.
". . . .
 "Q. . . . These things were occurring with regard to the restaurant in February, March and April of '87, did that have any effect on your life?
 "A. Well, yes, sir, I think anybody, under the tension and pressure that me and Leon was under — we took our frustrations out on each other, and, actually, I just started turning bitter. I just — and I'd just lost my mother, and these people'd come in and they were such great pals and I couldn't believe they were doing this to us, and I couldn't even believe the courts was letting 'em do this to us, and, yeah, we take our frustrations out. I started getting treated for a bleeding ulcer and high blood pressure and —
"Q. Have any problems sleeping at night?
 "A. We couldn't sleep. Leon couldn't sleep. Yes, we — yes, pressures was on both of us.
 "Q. You indicated that you all had some financial problems back around January of '87. Were you all placed on a cash basis by some of your suppliers?
"A. Yes, sir.
 "Q. Did you have some accounts at that time that had gotten past due and were due?
"A. Yes, sir.
 "Q. Was one of those accounts for the meat that you purchased there?
"A. Yes, sir, Southeastern.
" . . . .
 "Q. At a point in time did you all get behind some in the payment of quarterly taxes?
"A. Yes, sir.
" . . . .
 "Q. And when you signed that lease agreement did you understand that [the Tidmores] were to provide some more funds?
 "A. That's exact — yes, sir, to help us get all the back things caught up and get it back on a even — and this was one of the things that made it look so great — you know — they were willing to help us do this and all we'd have to pay 'em is the $5,000 a month which would go to the principal.
 "Q. Well, is there any reason you and Mr. Strahan didn't go out and try to borrow the money from some institution to buy the property from Vickie?
 "A. Well, we never really had a — never a reason to. Mr. and Mrs. Tidmore was always willing to help us.
 "Q. And was the execution of the new lease agreement — whose idea was that? Was it the Tidmores or was it yours or Leon's?
"A. Well, it was Mr. and Mrs. Tidmores'.
"[Cross examination — Mr. Paulk]
 "Q. I'll just begin right here, Mrs. Strahan. Do you remember any discussions about — In other words, what exactly did the Tidmores say was the reason that *Page 578 
they wanted to have a lease agreement with you all?
 "A. Well, they were — just like I said, they were good people, and they were just trying to do everything to help us. I — I really think they were just trying to get the place back. That's my opinion. Why they did it, I don't know. They were just great people."
Even though the jury properly could find that Exhibit B was not part of the lease, the jury could also consistently find that the Tidmores promised not to treat Exhibit B as part of the lease, that the promise was fraudulent because made with intent not to perform and with intent to deceive, and that the Strahans were damaged thereby, because of the Tidmore's attempts to enforce Exhibit B.
As a subpart of their first issue, the Tidmores argue that the Strahans' complaint is defective because it does not allege specific facts that constitute fraud as required by Rule 9(b), Ala.R.Civ.P. However, the rule requiring that the circumstances of the fraud be stated with particularity does not require that every element be stated with particularity, but only that the pleader must use more than generalized, conclusionary statements setting out the fraud; the pleader must state the time, the place, the content or substance of the false representations, the fact misrepresented, and must give an identification of what has been obtained. Robinson v. AllstateIns. Co., 399 So.2d 288 (Ala. 1981). In the case sub judice, the Strahans' complaint adequately set forth the facts that they contended constituted fraud. Paragraphs 9 and 10 of the complaint stated:
 "9. In January 1987, defendants proposed to plaintiffs a complex plan in which defendants would purchase the subject property from Vickie Robbins and lease the same to plaintiffs; in the discussions about this arrangement[,] defendants proposed a lease with option to purchase adding a number of conditions to which plaintiffs would not agree, set out as Exhibit 'B' hereto. On January 30, defendants informed plaintiffs that the proposed lease was ready for execution and that it was imperative that the lease be executed that day in the office of Ralph Smith, attorney for the defendants.
 "10. On January 30, 1986 [sic], plaintiffs met with the defendants in the office of Ralph Smith and discussed the proposed lease and specifically discussed the provisions proposed to be added as exhibit B to that agreement and set out as Exhibit 'B' hereto. Plaintiffs again refused to agree to such conditions and were told by defendants that the provisions of exhibit B were not to be a part of the lease to be executed between plaintiff and defendants, that the lease was the same as the lease with option to purchase they had executed with Vickie Robbins with the exception [that] the lease payment, term of lease and purchase price upon exercise of the option to purchase were changed. Plaintiffs executed a lease and was [sic] given an executed copy which had no exhibit B attached [to] it."
Count one, alleging fraud, stated:
 "The defendants over a period of months, fraudulently misrepresented facts to the plaintiffs, which they knew or should have known, to be untrue and conspired to deprive plaintiffs of their interest in the subject property and through said fraud and misrepresentations obtained plaintiffs' signatures on a lease agreement which contains conditions which plaintiffs did not agree to and which are impossible to comply with.
 "Within two weeks after Valley Properties, Inc. gained title to the subject property, defendants began efforts to take from plaintiffs possession of the subject property through inappropriate legal proceedings and various other fraudulent and unlawful acts and have tried to prevent plaintiffs from operating their business."
This pleading was sufficient to give the Tidmores fair notice as to the nature and subject of the Strahans' claim in fraud. To the extent that more specificity might have been appropriate, the Tidmores' proper remedy would have been to file a Rule *Page 579 
12(e), Ala.R.Civ.P., motion for a more definite statement. The complaint was not subject to dismissal, however, so no reversible error is presented by this issue.
Second, the Tidmores argue that it was error to deny their motion for directed verdict and their j.n.o.v. motion on the fraud claim. In an action for fraud it is necessary for the plaintiff to prove the following elements: (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff, (4) who was damaged as a proximate result of the alleged misrepresentation. Russellville Production CreditAss'n. v. Frost, 484 So.2d 1084 (Ala. 1986). If the fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. Id.
The Tidmores contend that there was no evidence presented at trial to support the claim that a material misrepresentation was made. They argue that the record is devoid of evidence from which the jury could find that the lease did not include Exhibit B and that, even if the jury could find that the Tidmores misrepresented that Exhibit B would not be included, the Strahans' reliance on any such representation was not reasonable in light of the documents presented to them at the January 30 meeting. They cite testimony by Leon Strahan in support of their argument.
 "Q. Would it be a correct statement to say that at least as far as the Tidmores were concerned that they were insisting on it or saying that Exhibit 'B' needed to be a part of the lease?
 "A. Yes, sir, he even — he wanted that — he wanted that put into force at Val Monte, even to the point he said if I was your daddy I spank your butt. That's the exact words.
 "Q. And, so, there was no — there was no misunderstanding that was what their position was and that's what they wanted —
 "A. Yes, sir, he wanted to ruin the business, yes, sir."
The Strahans in contrast maintain that there was substantial evidence presented showing that the Tidmores had attempted to include Exhibit B as a portion of the agreement, despite the fact that they (the Strahans) specifically objected to its inclusion. Mary Sue Strahan testified on direct examination as follows regarding the January 30 meeting:
 "Q. Do you recall any discussions that took place about that document?
 "A. There was no discussion. I didn't have to say anything; Leon said it all, that he wouldn't go along with it and it was ridiculous and there was no way he could run his business under operations like this.
 "Q. Did you ever see that Exhibit B on a day in Ralph Smith's office that you all signed the lease agreement?
"A. It was mentioned, but I didn't see it.
 "Q. Was there any discussion about Exhibit B in Ralph Smith's office.
 "A. I'm not even sure how it was brought up, Mr. Hanson, but Leon said, now, that's not part of what we went along with, Mr. Tidmore — he said you know that's not part of the lease — or the agreement that we had had, and Mr. Smith said, well, don't worry about that right now. That was — you know — just shook it off.
" . . . .
 "Q. And are you certain [Exhibit B] was not attached to your copy or to the lease when you signed it?
"A. No, sir, it wasn't.
" . . . .
 "Q. And when did you first discover that [reference] was in that paragraph, the reference to Exhibit B?
 "A. Well, like I said, Mr. Hanson, we didn't really go through it like we should in Ralph — because — it was basically — it was supposed to've been the same thing we had with Vickie, the lease — which we — he read thoroughly — I went through it. We didn't even see this or I didn't even notice it until *Page 580 
after we got the letter from Mr. Smith."
Mrs. Strahan testified on cross-examination as follows:
 "Q. Now my question is this about it. You knew at that time, prior to the execution of the lease, that the Tidmores were, in fact, asking you, at least, or stating they wanted additional provisions put into the lease; right?
 "A. They asked that, yes, sir, but we did not —
 "Q. So, it wasn't that you all agreed it would be the same lease — that's what you wanted, that's what you and Mr. Tidmore —
"A. That's what we agreed on.
"Q. I'm sorry?
 "A. Me, Leon and Mr. and Mrs. Tidmore, that's what our agreement was.
 "Q. And on the day that the lease was executed on January 30 there was some, at least, discussion about Exhibit B?
"A. Yes, sir.
 "Q. Tell the jury what you remember that discussion to be.
 "A. Like I told Mr. Hanson a while ago, I don't know how Exhibit B was brought up, and Leon said, Mr. Tidmore, you know that wasn't part of our agreement, and Ralph Smith said, well, don't worry about that right now; that's not important. It was just shunned off.
 "Q. And a physical copy of Exhibit B was not in the room at that time?
"A. No, sir.
 "Q. Did you read the lease yourself? I was a little unclear on whether or not you said you actually —
 "A. All right. The lease that we had signed with Vickie was supposed to've been the same lease agreement with the Tidmores, except the purchase price and a difference in the figures in the back and the purchase price of the building would be different, except that we wouldn't have to pay the earnest money, and we would pay $5,000 a month. Now, that was the agreement we had and we signed it in Ralph Smith's office."
Leon Strahan similarly testified as to discussions between the parties at the January 30 meeting concerning Exhibit B:
 "Q. Did you all have any discussions that day about Exhibit B that's been identified earlier by Sue?
 "A. Yes, sir. I don't know who brought it up that day, because Mr. Tidmore and I had already talked about that extensively at the restaurant and the last time that we talked about it there, around table center dining room [sic], I just told Mr. Tidmore there's no way anyone can live up to that — you know — there's only one manager of this place and that's ourselves, and that — you know — that document is just — it's a total farce — it could not be complied with. No. 1, we were not a McDonald's or we were not a Quincy's [restaurant].
 "Q. Did you have any discussions with them on January 30 in Ralph's office about whether or not it was going to be a part of the lease agreement?
 "A. Yes, sir, it came up. I don't recall like I say, who brought it up, but it came up, and I just flatly says, no, that could not be part of this — this document.
 "Q. Did anybody else make any statements with regard to that document?
 "A. No, the last time I insisted that this cannot be Mr. Smith just did his hands, like that — don't worry about it right now, and — you know — We went ahead and signed it, and the one that I signed and my wife signed did not have one on it, because I insisted it would not be there.
 "Q. Did the copy that — Did you leave there with a signed copy that day?
 "A. Yes, sir, in a manila envelope — or a brown envelope.
 "Q. Did it have — Do you know whether or not it had Exhibit B with it — on it?
"A. No, sir, it didn't."
The Tidmores argue that the Strahans could not have reasonably relied on the alleged misrepresentation that Exhibit *Page 581 
B would not be included in the January 30 lease because paragraph 33 of that lease incorporated Exhibit B by reference. A party is ordinarily bound by the terms of a document he signs in spite of inconsistent oral statements. See, e.g., Alpine BayResorts, Inc. v. Wyatt, 539 So.2d 160 (Ala. 1988).
If a party is lulled into a sense of security, however, by misrepresentations of the contents of a document by an agent of the other party, "the law inputes to him no knowledge of its contents." Southern Building Loan Ass'n v. Dinsmore, 225 Ala. 550,552, 144 So. 21, 23 (1932) (citations omitted); Taylor v.Dorough, 547 So.2d 536, 541 (Ala. 1989). In Arkel Land Co. v.Cagle, 445 So.2d 858 (Ala. 1983), an attorney for the defendant mineral lessee misrepresented to the plaintiff lessor that a certain portion of the plaintiff's property would not be included in the lease. This Court affirmed the plaintiff's fraud judgment. The diligence required of parties when initially contracting is greater than when the parties renew a contract. Woodlawn Fraternal Lodge No. 525, F. A.M. v.Commercial Union Ins. Co., 510 So.2d 162, 164 (Ala. 1987).
In this case, as in Woodlawn Fraternal Lodge, the controversy does not involve an initial contract between the Strahans and the Tidmores, but is based upon an ongoing business relationship. The Strahans had been operating Val Monte Steak House for a substantial period of time under an agreement with Robbins. The Tidmores were familiar with this arrangement, had visited the restaurant often, and had at times socialized with the Strahans. Additionally, the Strahans and the Tidmores had an established contractual history as a result of the loans the Tidmores had advanced to the Strahans. The two leases executed by the Strahans for the property (the Robbins lease and the Tidmore lease) are almost identical in form and content.
Paragraph 33 is on the next to last page of the 14-page lease. It is headed "Time of the Essence," and in the Robbins lease it simply read, "Time is of the essence in all provisions of this lease." Into the Tidmore lease was typed, after those printed words, "and subject to the terms and conditions set forth in Exhibit 'B,' attached." This addition would have been easily overlooked by the Strahans, who, being familiar with the Robbins lease, could reasonably have relied on the Tidmores' alleged representations that the new lease was the same as the Robbins lease except for certain financial terms.
The Strahans testified unequivocally that Exhibit B was not attached to the lease when they signed it, and the jury could have found from their testimony that the Tidmores' attorney induced them to sign the lease by representing that Exhibit B was not a part of the lease. Although there was a reference to Exhibit B in paragraph 33 of the lease, the jury could have found that the Tidmores' attorney lulled the Strahans into not examining the lease by telling them "not to worry about" Exhibit B, implying that it was not included in the lease and would not be enforced. In light of the relationship that existed between the Strahans and the Tidmores, together with the representations that the lease was the same as the Robbins lease and that Exhibit B would not be included, the jury could have found that it was not unreasonable for the Strahans to rely on the Tidmores' assertions that the lease did not contain Exhibit B and that the Strahans would not have to worry about it.
This Court stated the following in Super Value Stores, Inc.v. Peterson, 506 So.2d 317 (Ala. 1987), regarding proof of damages in a fraud action: "[I]f the plaintiff shows that he sustained actual damages as a result of the fraud, even though the exact amount may not be shown, the plaintiff is entitled to recover nominal damages, and, where appropriate, punitive damages." 506 So.2d at 334. Based on the evidence before this Court, we conclude that the Strahans have produced sufficient evidence to support the jury's verdict in their favor on the fraud issue. There is adequate evidence to support findings that the Tidmores tried to enforce the conditions of Exhibit B, contrary to their alleged representations that it would not be part of *Page 582 
the new lease, and that the Strahans were damaged by their actions. Furthermore, the presumption of correctness of a jury verdict is strengthened by the refusal of the trial court to grant a new trial. Lewis v. Ritch, 417 So.2d 210
(Ala.Civ.App. 1982). Therefore, we affirm the judgment on the fraud claim.
Next, the Tidmores argue that the trial court erred in overruling their motion for a directed verdict or j.n.o.v. on the claim alleging interference with a business relation. The Tidmores postulate, among other things, that this tort can be committed only by a party outside the contractual relationship. In other words, they argue that because a legal contractual relationship existed between them and the Strahans, they cannot be said to have interfered with the Strahans' Val Monte business. The Tidmores cite Hickman v. Winston County HospitalBoard, 508 So.2d 237 (Ala. 1987), in support of this position.Hickman involved a suit by an employee against her employer for interference with business or contractual relations. The Court held that the employer's breach of his own contract with the employee was not a basis for the tort. Id. at 238. However, the Court stated that the tort could be applicable to individuals acting outside their scope of employment. The Tidmores argue that if there was any cause of action to be sued upon, which they dispute, it would have been one for trespass or breach of contract.
A claim of intentional interference with a business relation, to be actionable, requires: (1) The existence of a contract or business relation; (2) defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) absence of justification for the defendant's interference; and (5) damage to the plaintiff as a result of the defendant's interference. Gross v. Lowder Realty Better Homes Gardens,494 So.2d 590 (Ala. 1986). The Gross case outlined a new rule of law in Alabama. The purpose behind the creation of a single set of elements was to establish a framework broad enough to encompass both the tort of interference with business relations and that of interference with contractual relations.
Although the Tidmores and the Strahans were parties to a contract, the alleged interference by the Tidmores was not with that relationship. The Strahans' claim relates to the relationship between the Strahans and their employees and customers at the Val Monte Steak House business, not the relationship of landlord and tenant between the Tidmores and the Strahans. As to this issue, the record reveals sufficient evidence to support the jury's finding in favor of the Strahans. Leroy Strahan, Leon's brother, testified that many customers were dissatisfied and uncomfortable as a consequence of the presence of the various inspectors and deputies on the property:
 "Q. Did you see any difference in the crowds that were there? Difference in the numbers of people that were there in early '87?
 "A. There was some confusion in the early part — like February and March. People were confused. A lot of talk out on the street.
 "Q. Did you ever observe any deputies posted there at night?
"A. Yes, sir.
"Q. Do you recall when that was?
 "A. Probably the middle of March, somewhere in that neighborhood.
"Q. Could it have been as late as possibly April?
"A. Yes, sir, it could.
 "Q. How long a time did this go on, the deputies there?
 "A. They stayed there for about 2 or 3 weeks, and then after that they had people posted in vehicles sitting across the street, to find out what was going on at the operation and what was happening, and these people had identified themselves that they were doing that —
". . . .
 "Q. Do you have a judgment whether or not deputies being at a business, at a nightspot would have any effect on the crowds?
". . . . *Page 583 
 "Q. Do you have a judgment whether or not it would affect your business?
"A. Sure I do.
"Q. Would that effect be good or bad?
"A. It would be bad.
 "Q. Did you observe any changes in the business while they were posted there?
"A. A lot of confusion.
 "Q. The effect wasn't good; is that what you're saying?
"A. It wasn't good — it was bad."
The record reflects that the Tidmores hired former Steak House employees to watch the premises. Leroy testified that the Tidmores had confused other employees by telling them that they were going to take over the place:
 "Q. Did you ever observe any problems with employees during that time?
 "A. The people were confused. He was confusing the people that was working there.
". . . .
 "Q. Did you observe any problems with employees during that period of time?
 "A. Problems off and on. I wasn't the one hiring and letting people go, but a lot of the people that were — were discouraged and did leave."
Thus, the Strahans' claim is not barred by the rule that the tort of intentional interference applies only to acts by third parties as to the business relation, even though there were also business relations between the Tidmores and the Strahans. Because sufficient evidence was presented to sustain the jury's verdict on the claim of an intentional interference with business relations, we affirm the judgment as to this issue.
The Tidmores next claim that it was reversible error to allow the Strahans to present evidence to the jury of the Tidmores' financial condition. It appears that the trial court allowed the Strahans to cross-examine Mr. Tidmore after he made statements to the jury on direct examination by his attorney that he had told Leon Strahan that "we've mortgaged everything we've got. At my age we've got no retirement income or anything. We've got [sic] mortgaged everything we've got to put you in business. . . ." The Tidmores attempt to draw a distinction between Mr. Tidmore's testifying to what he told Mr. Strahan and his testifying directly to the jury that he had mortgaged everything he had. They contend that, because the statements were made within the context of a conversation between him and Leon Strahan, Tidmore was not holding himself out to the jury as being in poor financial condition, and, therefore, that the testimony was irrelevant and prejudicial and should have been excluded. The trial court, however, properly found that the testimony had the effect of placing the Tidmores' financial condition before the jury.
The latitude and extent of cross-examination are matters within the discretion of the trial court and are revisable on appeal only for prejudicial abuse, and a party claiming such an abuse of discretion has the burden of persuasion. Hembree v.City of Birmingham, 381 So.2d 664 (Ala.Crim.App. 1980). Because the Tidmores put their financial condition before the jury, the Strahans were entitled to cross-examine them in regard to that matter; therefore, there was no abuse of discretion.
The Tidmores next argue that it was error for the trial court to deny their motions for summary judgment, directed verdict, and j.n.o.v., on their eviction action. Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. McMullin v. AmSouth Bank, 512 So.2d 1382 (Ala.Civ.App. 1987). A directed verdict or j.n.o.v. is proper only where there is a complete absence of proof on a material issue as to the claim or defense. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982). Both the Tidmores and the Strahans offered plausible evidence to support their arguments. For instance, the Tidmores proffered documentation that the Strahans had defaulted on an agreement to make a security deposit and that they had allowed the property insurance to lapse. The Strahans countered with affidavits and testimony that the Tidmores had told them the security deposit was not necessary. *Page 584 
They also showed that a new insurance policy had been issued on the same day the old policy had lapsed, and that, therefore, the property was never without coverage. Clearly, the Strahans presented evidence as to issues in support of their defenses to the eviction claim, and the trial court was correct in denying the Tidmores' motions.
Last, the Tidmores argue that the trial court incorrectly charged the jury on their claim alleging breach of contract. They argue that the following statements by the trial judge, concerning when a lessor may recover property, were misstatements of the law: (1) that a lessor is required to allow a lessee a "reasonable time" within which to cure a default before the lessor can recover the premises; (2) that notice must be given in order to terminate possession; and (3) that a default must be a material one for the landlord to be entitled to regain possession of the property.
It is the duty of the trial judge to instruct jurors fully and correctly on the applicable law of the case and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in the search for truth.Grayco Resources, Inc. v. Poole, 500 So.2d 1030 (Ala. 1986). However, it is within the province of the jury to apply the law as it is given to them to the facts of the case. Raines v.Williams, 397 So.2d 86 (Ala. 1981).
The record reveals that the lease between the Tidmores and the Strahans specifically defines what conditions constitute default. It states that if a lessee fails to comply with any of those conditions then the lessor shall give notice to the lessee in writing, sent by registered mail, postage prepaid and return receipt requested. There was no evidence that the Tidmores complied with the notice requirements. Having failed to prove compliance, a landlord is not entitled to a reentry of the premises and a forfeiture. Noel Smith Dev. Co. v. NationalFiltronics, Inc., 360 So.2d 338 (Ala. 1978); Nelson v. DarlingShop of Birmingham, Inc., 275 Ala. 598, 157 So.2d 23 (1963). Because the lease specifically required notice and there was no evidence that the Tidmores satisfied the notice requirement, the court correctly charged the jury that the Strahans had a reasonable time in which to cure any default.
No reversible error is presented by the Tidmores' contention that the trial judge's instruction that a default, to justify eviction, must be a material one held the Tidmores to a higher standard than is required by law. Since the lease itself required notice and the Tidmores did not give the Strahans notice of default and a reasonable opportunity to cure, the materiality of any defaults committed by the Strahans is irrelevant to the Tidmores' right to evict them, and any error in the instruction was harmless. Rule 45, Ala.R.App.P. Reversible error in the giving of an instruction occurs only where that error is prejudicial. Underwriters Nat. Assur. Co.v. Posey, 333 So.2d 815 (Ala. 1976). We find no prejudice in this instance.
A judgment based on the verdict of a jury is presumed to be correct and will not be reversed unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is found to be so decided so as to clearly convince this Court that it is wrong and unjust. Shelby County v. Oldham, 264 Ala. 626, 89 So.2d 106,107 (1956).
Because we find no reversible error, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ADAMS and STEAGALL, JJ., concur.
[1] Robbins is not a party to this action.
[2] Although the Strahans' brief actually refers to the section as § 6-5-10, because of the text quoted it is clear that they are referring to § 6-5-103. *Page 585