STEAGALL, Justice.
Greg McGinnis, Judy McGinnis, and their three minor children sued Continental Insurance Company; Fidelity Casualty Company of New York; the Starke Agency, Inc.; Continental Loss Adjusting Service and its agent, John Long; the Water Works Board of the City of Montgomery, Alabama; and the Sanitary Sewer Board of the City of Montgomery, claiming damages based on a blocked municipal sewer line. The McGin- *471 nises alleged that the City of Montgomery had negligently and wantonly failed to properly maintain, repair, inspect, and construct the sewer line and thereby had caused a continuous two-year leakage of raw sewage into their house and yard. The McGinnises also alleged breach of contract, bad faith, conspiracy, misrepresentation, and breach of fiduciary duty on the part of the insurance companies and Long, based on these defendants’ refusal to pay for damage or harm to their property and their persons arising from the leakage of sewage. Delores Wells, the mother of Judy McGinnis and owner of the property, was allowed to intervene as a plaintiff. The trial court dismissed the Starke Agency from the action upon joint motion of the parties and entered a summary judgment in favor of the remaining defendants. The McGinnises appeal.
A summary judgment is proper only where there exists “no genuine issue as to any material fact” and the “moving party is entitled to a judgment as a matter of law.” Rule 56(c)(3), A.R.Civ.P. Once the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to produce substantial evidence creating such an issue. Ala.Code 1975, § 12-21-12; Murdoch v. Knollwood Park Hospital, 585 So.2d 873 (Ala.1991). “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); § 12-21-12(d). In determining whether there is a genuine issue of material fact to be determined by a jury, this Court must view all facts in a light most favorable to the nonmovant and draw all reasonable inferences favorable to that party. Murdoch.
The McGinnises in 1987 moved into a' house owned by Delores Wells. In 1988, the McGinnises’ washing machine began to overflow, and the floor underneath buckled from the constant moisture. Wells’s insurance company sent workers to assess the problem and to repair the floor. Two weeks later, the washing machine began overflowing again. The McGinnises then began having problems ' with their bathroom plumbing; the problems escalated to the point that raw sewage flowed throughout their yard from a pipe that connected the house to the sewer line; the sewage flowed throughout the floors and walls of their house from their overflowing toilets. The McGinnises consulted several plumbing companies, who advised them that there was an obstruction in the municipal sewer line in the street in front of their house and that they should contact the municipal authorities.
The McGinnises contacted the Water Works Board numerous times, and the Board sent two workers to examine the street. The McGinnises say the workers merely lifted the manhole cover above the sewer line and pointed out that water was flowing properly through the line and then advised the McGin-nises that there was no problem with the city line and that they should get a private plumber to fix the problem. Over the next two years, the McGinnises employed plumbers on 13 occasions to repair the problem; each time, the plumbers told the McGinnises that there was an obstruction either in the street or in the Sanitary Sewer Board’s line. One of the companies even spray painted a large orange “X” on the spot where the obstruction seemed to be.
In response to the McGinnises’ continuous complaints, the Water Works Board sent workers to inspect the line on 35 separate occasions; however, each time, the McGinnis-es say, the workers gave the line a cursory examination and informed the McGinnises that there was no problem with it. Meanwhile, the problems caused by the raw sewage intensified and the McGinnises began contacting the State Highway Department and the mayor of the city, as well as the Water Works Board, to plead for help.
In May 1990, the Water Works Board informed the McGinnises that it was going to dig up the sewer line to show “once and for all” that the fine was problem-free. When it dug up the line, it discovered a large chunk of street asphalt lodged in the sewer pipe; that chunk of asphalt was blocking the line and causing the raw sewage to back up. The Water Works Board repaired the line and spread deodorized sand across the McGinnis- *472 es’ yard to minimize the odor that had been emanating from the ground for two years.
The Water Works Board informed the McGinnises that it would send an insurance adjuster to assess their claims. John Long, an adjuster for Continental Loss Adjusting Service, met with the McGinnises three days later. Judy McGinnis produced two or three estimates she had made of some of the damage to the house, including replacement of carpets, vinyl flooring, and plumbing and bathroom fixtures, which totaled about $4100. Long added $898.37 as compensation for expenses and offered the McGinnises $5000. Long gave the McGinnises a release form, which contained the words “RELEASE OF ALL CLAIMS” and “Read Carefully Before Signing,” as well as a lengthy explanation written in formal, legal language.
The McGinnises at first refused to sign the release, because, they said, they were concerned that it would bar later recovery for losses that were ongoing or not yet discovered. According to the McGinnises, Long assured them that the $5000 was merely an installment on the amount the McGinnises could recover and that the language about “releasing all claims” was merely a “technicality” that would not bar them from filing for more compensation. He also told them that they could not have the $5000 installment unless they signed the form. They read and signed the form, then received a check for $5000 several weeks later. At the bottom of the check, beside a box labeled “nature of payment” were the words “ANY AND ALL CLAIMS AGAINST THE WATER WORKS BOARD OF MONTGOMERY.” The McGinnises indorsed and cashed this cheek and immediately applied the proceeds to outstanding repair and medical bills. The McGinnises thereafter contacted Long to obtain compensation for these and other bills that had arisen; they were informed that the release they had signed barred any further recovery for their losses.
In its summary judgment for the defendants, the trial court held that the release form was valid and thus barred the McGin-nises’ claims against the defendants. The McGinnises point out, however, that if a release is obtained from one in a weakened condition, without advisers, for a sum grossly less than an amount that would be fair and just compensation, there is a question of fact as to whether the release was obtained through fraud and is thus void. Taylor v. Dorough, 547 So.2d 536 (Ala.1989).
In deposition, Greg McGinnis gave the following testimony concerning his signing of the release:
“Q. Okay. Tell me as best you can recall sitting here today exactly what all happened once y’all went into the kitchen?
“A. The only thing that I can remember is Mr. Long — we all sat down in the kitchen. He had asked my wife earlier the day before or so to get up some estimates of damages we thought ... occurred because of the sewage. We gave him the estimates that we had. We explained to him that we still hadn’t gotten all the estimates. We didn’t know what kind of damages had been done between the walls. And, you know, we didn’t have all of our bills together.
[[Image here]]
“Q. Let’s go back to that conversation you and Mr. Long and your wife had in the kitchen that day. You said y’all had talked to him, and he wanted to pay y’all some money?
“A. Right. He wanted to give us a check that day, get us started to get our house back together.
[[Image here]]
“Q. Okay. Did — when you signed the release form, I guess, he just handed it over to you and gave you a chance to look at it?
“A. Yes, sir.
“Q. Did you ask — did you take a chance to look at it or read it or to ask him any questions about it?
[[Image here]]
“A. Just the written — that part that was written in on the top is the only part that I read.
“Q. Was there any reason why you didn’t take time to read the entire portion — the entire release?
*473 “A. It was pretty much explained to me — Mr. Long explained it to me.
“Q. Okay. What did he tell you about it?
“A. He just said that this was a formality that he had to do in order to write us a check.
“Q. Okay. Did he tell you anything else about that?
“A. No. Said that when we got the rest of our estimates up, we would be able to get the more money that we were entitled to.
[[Image here]]
“Q. Was it your understanding then that Mr. Long was just going to keep paying you for whatever bills or estimates you were going to bring him later on?
“A. Right. That was my understanding.
“Q. And was it your understanding that he could refuse to pay those if he wanted to or that he was just going to pay them regardless?
“A. It was my understanding that he was gonna pay them.
“Q. Okay. So what — it was your understanding that whatever you and your wife gave to Mr. Long after that meeting, any bills or estimates that you had, that he was going to pay those and not ask any questions about them?
“A. Yes, sir. If they were incurred because of the water damages, yes, sir.”
In her deposition, Judy McGinnis gave the following testimony concerning her signing of the release:
“Q. Did [Long] let you read that document before you signed it?
“A. No, sir. He explained — he told me that he was explaining it to me. He said he was there today to issue me a cheek for $5,000 to help us get started on some of our repair work. And he said that this was by no means — I told — I said, now, Mr. Long, I said, We don’t have up nearly hardly all of our, you know, esti-. mates or anything.’ He said, ‘This don’t matter.’ He said, ‘This is only to get me started. It’s more or less a formality to get me started on helping y’all get on your feet.’ And so he explained it to me. I read this, and I signed it.
“Q. What did he explain to you about it?
“A. He told me that this was just to get me started that day. To give him permission to issue me a check for that date.
[[Image here]]
“Q. At the time that you signed this, did you feel like he was pressuring you to sign the thing?
“Á. No, not really pressuring me. It was just — I mean, I was just — you have to realize that we had lived in these conditions for two years, and then here this man — I mean, we were totally broke. And this man was offering me a check for $5,000 for me to sign this, but by — in the same aspects this was not the end of it as to what he made me believe. This was just to sign it for that day to get the money that day. It wasn’t, you know, a forever thing.
“Q. So you weren’t signing this thing — he wasn’t forcing you to sign it, was he?
“A. No. He told me — he told me he couldn’t release the money unless I signed this for that day.
“Q. And you were willing to take that money and to sign this to get that money?
“A. For that day.
“Q. Right.
“A. But he also knew — I told him over and over and over that we did not have all of our estimates. I mean, I would not have signed an agreement for $5,000 when I have $30,000 in strictly hospital bills.”
Judy McGinnis further testified that Long did not give them the check that day; rather, he wrote an I.O.U. for the $5000 that the McGinnises could show to workers to prove that they could pay for the repairs that needed to begin immediately.
When viewed in a light most favorable to the McGinnises, the record indicates that the McGinnises were in a weakened condition when they signed the release and that the $5000 “settlement” was grossly disproportionate to the damage caused by the blocked sewer line. The family had lived for two *474 years in a house literally awash with the moist filth of raw sewage, which rotted the carpets, floors, walls, and even the columns of the structure, destroyed the lawn, and left behind an unmistakable stench. The record indicates that the McGinnises’ relatives and friends refused to visit them because of these repulsive conditions. During this period, both Greg and Judy McGinnis were hospitalized at various times for stomach and intestinal problems. The harm the plaintiffs suffered was caused by a problem that the City of Montgomery created and could have discovered upon serious investigation of the family’s repeated complaints. We decline to dwell upon the undisputed and nauseating details contained in the record; it is enough to state that the evidence indicates that the problem rendered the house unlivable and took a serious physical and mental toll on the McGinnises, at a time when Greg McGinnis was unemployed and unable to pay bills that had been caused in large part by the problem. These facts present a fact question as to whether the release was obtained through fraudulent inducement and is thus void. Taylor v. Dorough, supra.
The summary judgment is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
MADDOX, ALMON and HOUSTON, JJ., dissent.