431 So.2d 1155 (1983)
JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY
v.
Ray KELLER.
81-548.
Supreme Court of Alabama.
March 11, 1983.
Rehearing Denied May 6, 1983.
Clyde C. Owen, Jr. of Ball, Ball, Duke & Matthews, Montgomery, for appellant.
Charles A. McGee, Fort Payne, for appellee.
PER CURIAM.
Ray Keller sued John Deere Industrial Equipment Company, Inc. (John Deere), *1156 and its employee, William Roffey, claiming damages for (1) breach of contract; (2) fraud and misrepresentation; and (3) conversion. At the close of the evidence, Roffey was dismissed as a defendant. The trial court submitted all three claims against John Deere to the jury, overruling its motions for directed verdict as to each. The jury returned a $50,000 verdict in favor of plaintiff Keller. John Deere appeals and raises the following issues:
Did the trial court err in denying defendant's motion for directed verdict on the conversion claim?
Did the trial court err in allowing the jury, over timely and appropriate objection, to consider punitive damages under all theories of the case? and finally,
Whether the trial court erred to reversal in not granting a new trial because the jury verdict is excessive.
We agree with John Deere that the trial court erred in submitting the conversion claim to the jury. For this reason, the cause must be reversed and remanded for a new trial.
The material facts are without substantial dispute.
Johnny Summers owned a new John Deere log skidder for which he had paid $55,000 five months before it crashed over a cliff near Scottsboro. When that occurred, William Roffey, who was an employee of John Deere, investigated the accident and agreed to settle the insurance claim with Summers for $50,000. Roffey testified that Summers told him he was not interested in the salvage, so Roffey went to the John Deere dealership in Scottsboro the same day to see if he could sell the wrecked skidder to the dealer. Ray Keller was present as a customer and asked Roffey if he could bid on the salvage. Roffey responded that he could, and Keller bid $50 for the wrecked skidder.
Keller sent two men to search for the skidder. They eventually found it and reported that it would not be too difficult to retrieve from the ravine into which it had fallen. Keller made no immediate attempts to remove the skidder and, about two weeks later, learned that it was on Roy Chisenall's property.
Summers, Keller, and Chisenall were all in the logging business and had known each other all of their lives.
After Keller confirmed that the skidder was in Chisenall's yard, he called Roffey, who agreed to come to Stevenson, Alabama, where Keller lived, to try to get all of the parties together to resolve the matter. Keller and Roffey met with Summers and Chisenall. Keller's testimony about this meeting was:
"Well, Mr. Roffey asked Mr. Summers why he sold that skidder; or if he did, what did he do with the skidder maybe that'sand he said he sold it. Mr. Summers said he sold it and Mr. Roffey said, well, why did you sell it; he said, well, you told me that I could have it; and he said, Mr. Roffey, said, I didn't tell you that you could have it; and he said, well, you told me that I could have parts off of it and you said that couldn't nobody get it out and you said if I wanted something off of it that I could have it; said, that's the same as giving it to me; so, I sold it."
At this meeting, Mr. Chisenall agreed to relinquish possession of the skidder to Mr. Keller, who agreed to let him have four rims worth $400 to $500 each off it to compensate Chisenall for getting the skidder out of the ravine. Chisenall later changed his mind and refused to deliver the vehicle.
Keller testified that Mr. Roffey suggested that he get help from the authorities and that, at one time, he did talk to the sheriff's office. Keller then tried to get a bill of sale from John Deere and was unsuccessful.
In the meantime and after the meetings between Roffey, Keller, and Chisenall had failed to resolve the matter, Summers's insurance claim was paid, and $500 was deducted for the salvage, the amount Summers had received from Chisenall. Keller retained a lawyer, who wrote to John Deere about the matter. A Mr. Rhinesmith responded that John Deere did not have title to the skidder when Keller purportedly purchased it. This suit followed.
*1157 The conversion claim is based upon the alleged gift of the skidder to Summers by Roffey. It is without contradiction, however, that the conversation between Summers and Roffey, which Summers interpreted to amount to a gift of the skidder, took place before Roffey met Keller. There is no evidence whatsoever which will support an inference that Roffey or anyone else from John Deere converted the skidder after the sale to Keller. There is no evidence that Roffey met with or had any conversation with Summers or Chisenall before being called by Keller after the skidder was moved to Chisenall's property. Neither Chisenall nor Summers contended otherwise. Summers testified that his sale of the machine to Chisenall was based upon his understanding that Roffey's allowing him to take parts off the machine was equivalent to giving him the machine itself and, with that understanding, he sold it to Chisenall. This evidence may support an inference that Roffey gave the skidder to Summers, but that transaction took place before the Keller bid was accepted, and, therefore, will not support the inference that John Deere converted Keller's property to Summers after the sale to him. Keller had no title or interest in the skidder at the time of the alleged gift to Summers. Therefore, his interest could not have been converted at that time. Tucker v. Franklin, 285 Ala. 460, 233 So.2d 470 (1970).
The same evidence which precludes the conversion claim, however, would support a finding of breach of contract and also a claim of misrepresentation. If the jury agreed with Summer's interpretation of the conversation with Roffey and that it amounted to a gift to him of the salvage, then John Deere could not thereafter sell the same to Keller, and that would mean Roffey misrepresented the fact of ownership to Keller in accepting his bid for the salvage and assuring him that the skidder was his.
The trial court was, therefore, correct in allowing the jury to pass on this evidence as it related to the claim for breach of contract and fraud. It erred, however, in denying John Deere's motion for directed verdict on the conversion count.
In Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala.1981), the Court held:
"[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
It follows from this holding that, if the defendant files a motion for directed verdict as to a count which is not supported by the evidence and the court denies such motion, a general jury verdict will not be presumed to have been returned on a count which is supported by the evidence. This is precisely what occurred in this case. We cannot presume that the general jury verdict relates to one of the counts which the evidence did support, where it is equally possible that it is based on the count which is unsupported by the evidence. Coffee County Bank v. Hughes, 423 So.2d 831 (Ala. 1982). See, also, Estes v. Nix, 401 So.2d 62 (Ala.Civ.App.1981), writ denied, 401 So.2d 64 (Ala.1981). For this reason, the judgment must be reversed and the cause remanded for a new trial.
We also observe that the court erred as well in allowing the jury to impose punitive damages on the count for breach of contract. Punitive damages are generally not allowed in actions for breach of contract. Wood v. Citronelle-Mobile Gathering System Co., 409 F.2d 367 (5th Cir.1968); Geohagan v. General Motors Corp., 291 Ala. 167, 279 So.2d 436 (1973). This case does not fall within the narrow exception to that rule.
Only if, on a retrial of the case, the jury finds that John Deere, through Mr. Roffey, intentionally and deliberately misrepresented *1158 to Mr. Keller that John Deere had authority to sell the skidder (when it did not in fact) with the intention to defraud Keller and that such conduct resulted in the damage claimed, may punitive damages be awarded on the fraud claim.
The judgment is reversed and the cause remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
JONES, J., dissents.
JONES, Justice (dissenting).
I respectfully dissent. My disagreement with the majority opinion is limited to one point: The sufficiency of the evidence relating to the conversion claim. The majority finds: "There is no evidence whatsoever which will support an inference that Roffey or anyone else from John Deere converted the skidder after the sale to Keller." The fact that John Deere's agent, Roffey, never "met with or had any conversation with Summers or Chisenall before being called by Keller after the skidder was moved to Chisenall's property", in my opinion is not conclusive of the conversion issue.[1]
The following facts are added to those stated in the Court's opinion:
After Keller's efforts to obtain possession of the skidder failed, he next asked Roffey to put him in touch with Roffey's superior, Mr. Ivanowski. Keller explained his predicament to Ivanowski; whereupon, Ivanowski replied that he would make a decision as to who owned the skidder within a couple of weeks. According to Keller, he later learned that $500 had been deducted by John Deere from Summers's settlement with them of his insurance claim.[2] Keller again spoke with Ivanowski, who finally told him that his (Ivanowski's) hands were tied, and that he could not help Keller obtain ownership or possession of the skidder. Keller asked Ivanowski for a bill of sale, whereupon Ivanowski said he could not furnish such documentation and that Keller would probably soon receive his $50 back from John Deere (which was subsequently tendered to Keller).
Later, Keller retained a lawyer (Mr. Royal), who wrote a demand letter to John Deere concerning the scenario with the skidder. Robert A. Rhinesmith, claims supervisor for John Deere Insurance Company, responded to Royal's correspondence, advising Royal that none of the John Deere Companies had title to the skidder at the time Keller purchased it. Rhinesmith went on to say that the salvage value of the skidder was deducted from the total loss settlement with Summers, and the company had no further interest in the disposition of the salvage. At this point, Keller filed suit against Roffey and John Deere Industrial Equipment Company.
In essence, Keller claims that John Deere "wrongfully converted" his property (the skidder) by conveying it to Summers after Keller had purchased it from John Deere's agent, Roffey.[3] John Deere insists that plaintiff totally failed to meet his burden of *1159 proof with respect to conversion, pointing out that the evidence does not disclose John Deere's involvement with any conveyance of the skidder after the Keller/Roffey transaction.
I have carefully reviewed the entire record; and I find more than ample evidentiary support from John Deere's own witnesses to sustain Keller's conversion count. In detailing the evidence of record, seeking to demonstrate a lack of proof as to conversion, John Deere overlooks two relevant aspects of a sordid scenario unfolded through its own evidence.
First: John Deere's agent, Roffey, never varied from his straightforward version of the Keller/Roffey transaction. After agreeing to pay Summers the retail value of the skidder, less the deductible, he sought and found in Keller a purchaser for the salvage. If the jury believed, as it had the right to do, Roffey's unequivocal assertions that John Deere owned the skidder at the time he accepted Keller's $50, it needed only to find further that John Deere, in some material manner, wrongfully exercised dominion over the skidder in defiance of Keller's title and immediate right to possession. Ott v. Fox, 362 So.2d 836 (Ala. 1978).
Second: Again, this latter element of the offenseJohn Deere's wrongful exercise of dominion over the skiddercan be readily inferred from John Deere's telephone conversation and correspondence with Keller and his lawyer. Rather than disclaiming any interest in the salvage when first contacted by Keller, John Deere's home office stated that it would decide who was the rightful owner. Later, John Deere confirmed that it had negotiated a disposition of the salvage to Summers by further reducing his insurance claim by an additional $500the amount Summers received from Chisenall. Certainly, the totality of these circumstances contradicts John Deere's denial of its involvement in preventing Keller's ultimate possession of the skidder.
I conclude, therefore, that the trial judge did not err in denying the defendant's motion for directed verdict as to the conversion claim.
Because of my disagreement with the majority as to the sufficiency of the evidence in support of the conversion claim, I also need to address the punitive damages issue in order to fully explain my reasons for dissenting. Under the "argument section" of its brief, John Deere states: "[A]ssuming that the conversion count was properly submitted to the jury, the evidence is lacking to justify their consideration of punitive damages under any of the theories of liability."
Because our respective discussions of the liability aspects of this case have been confined to the conversion count, and, because the appellant concedes, for the purposes of this appeal, that evidence to support punitive damages "under any of the theories of liability" will sustain an award of punitive damages, I will now confine my consideration of the award to the claim for conversion.[4]
Initially, it is my observation that as between the conversion claim and the fraud claim, due to the extremity of the facts supportive of the fraud claim, appellant's strongest argument on the point of damages relates to the conversion claim.
In order for the jury to find that John Deere converted Keller's property, it necessarily had to believe that John Deere disposed of, or otherwise interfered with, Keller's right of possession of the skidder salvage after it had accepted Keller's $50 in payment for the property.

*1160 "[T]he law in Alabama is that, if evidence is presented to the jury which shows that a party has converted property in known violation of the owner's rights and in violation of the law, punitive damages may be assessed...." Gunite Contracting Company, Inc. v. Mize, 341 So.2d 694, 695 (1977).
Thus, in testing the propriety of punitive damages, we must look to the evidence, and the inferences which may be reasonably drawn therefrom, to determine whether John Deere "converted property in known violation of the owner's rights." Here, John Deere's agent negotiated a sale of the skidder salvage with Keller and accepted the agreed upon price of $50. Given a finding by the jury (consistent with the agent's own testimony) that John Deere owned the salvage; had a right to sell it; and in fact did sell it to Keller, John Deere's subsequent involvement (again, consistent with the facts contained in John Deere's letter to Keller's lawyer) in disposing of the property in defiance of Keller's rights furnished an ample evidentiary basis for its further finding that John Deere's conversion was wilfull, or the result of a trespass under circumstances of insult or malice; and thus the jury was authorized, in its discretion, to award punitive damages.
The circumstance which here tends to aggravate the degree of the wrong committed by John Deere lies in the fact, if believed by the jury, that it was John Deere itself that conveyed the very property which it later consciously and knowingly prevented Keller from possessing. The jury was free to infer from these circumstances that John Deere consciously, knowingly, and with intent to injure Keller, elected to return to Keller his $50 and to accept in its stead the $500 price which Summers had obtained from Chisenall for the same item of equipment.
It was this $450 "advantage" which the jury could reasonably infer from the total circumstances of the case as the motivating force for the wrong committed by John Deere to the damage of Keller. These circumstances relegate to insignificance the relative smallness of the price paid by Keller for the property. Once the jury believed that version of the evidence which supports Keller's claim for conversion, it was no longer dealing with mistake, inadvertence, or a mere innocent lack of communication; rather, it was dealing with overt, conscious conduct which could only have been calculated to work to the prejudice of the known legal rights of Keller.
No citation of authority is necessary to buttress the elementary principle that one who consciously and intentionally disposes of another's property, without the owner's authority or consent, acts in defiance of the owner's rights in known violation of the law. For the reasons stated, I would affirm the judgment.
NOTES
[1] While the date of the Roffey/Keller transaction is not in question, the Defendants' witnesses took conflicting positions whether this occurred before or after its disposition of the skidder to Summers. Roffey insisted that he had made no disposition of the unit prior to its sale to Keller. Other witnesses for John Deere maintained that Roffey's sale to Keller occurred after the salvage had been sold back to Summers.
[2] This $500 is in addition to the $500 insurance deductible, which fact is verified in John Deere's reply to Keller's lawyer's demand letter.
[3] Because John Deere's own witnesses gave conflicting evidence as to the sequence of events surrounding its disposition of the skidder, plaintiff claimed in the alternative that, in the event John Deere had sold the salvage back to Summers before Roffey sold it to him, John Deere committed breach of contract and fraud by misrepresenting that it held legal title to the property when it accepted his $50 for the purchase of the skidder salvage. Although the issues raised on appeal do not invoke our review of the latter two claims, I agree with Appellant that we must find evidence to support the conversion claim in order to uphold the judgment based upon a general verdict.
[4] Again, I agree with Appellant's postulation of this issue. For the sake of clarity, it is noteworthy to observe that the trial court submitted the case to the jury for its consideration of punitive damages only as to the conversion and fraud claims, not as to the breach of contract claim. Otherwise (that is, had the trial court not precluded punitive damages as to the contract claim), Appellants could have successfully argued that the trial court erred in its denial of Defendant's motion for a new trial, because, punitive damages not being allowable for breach of contract in this instance, the general verdict would not have been referable to the other claims.