INGRAM, Justice.
Norman Gene Donaldson, a former employee of National Security Insurance Company, sued National Security and its president, Jack Brunson, alleging claims of bad faith, outrage, breach of contract, fraud, and retaliatory discharge. The trial court entered a summary judgment for the defendants on Donaldson’s bad faith, outrage, and breach of contract claims. The trial court directed a verdict for the defendants as to a portion of Donaldson’s fraud claim, but submitted another portion of the fraud claim[1] and the retaliatory discharge claim to a jury. The jury returned a general verdict for Donaldson in the amount of $500,000 in compensatory damages against Brunson and $3,000,-000 in punitive damages against National Security; the trial court denied National Security and Brunson’s motions for J.N.O.V and new trial. National Security and Brun-son appeal.
A jury’s verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust. Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162 (Ala.1988). In addition, a judgment based upon a jury verdict and sustained by the denial of a postjudgment motion for a new trial will not be reversed unless it is plainly and palpably wrong. Aslnbee v. Brock, 510 So.2d 214 (Ala.1987). Because the jury returned a verdict for Donaldson, any disputed questions of fact must be resolved in his favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict. State Farm Auto. Ins. Co. v. Morris, 612 So.2d 440, 443 (Ala.1993). In short, when reviewing a judgment based upon a jury verdict this Court must do so in a light most favorable to the appellee. Continental Cas. Ins. Co. v. McDonald, 567 So.2d 1208, 1211 (Ala.1990).
The record, viewed in a light most favorable to Donaldson, Continental Cas. Ins. Co., supra, suggests the following facts:
Donaldson began working for National Security as a district manager in October 1984, in National Security’s Phenix City, Alabama, office. Donaldson was very effective as district manager, and his district became one of National Security’s most successful business districts. In 1987 Donaldson was promoted to regional manager; he continued to work in the Phenix City office. Donaldson testified that in November 1988, Brunson asked him to visit National Security’s home office in Elba, Alabama, and that he did so; Donaldson said that during that visit Brunson spoke with him about the impending retirement of National Security’s vice-president, Earl Peters. According to Donaldson, the conversation went as follows:
“[H]e told me that he had been well pleased with the job that I had done since coming with the company. That Phenix City ... under my leadership ... had grown to the second largest district in the company....
“He told me that in 1989, that Mr. Peters was going to be retiring and that he had his eye on me as the man that he wanted to step in that position.... [H]e told me that what he would like for me to do is to go ahead and move my family to the Elba area, that he would go ahead and give me a $5,000 raise effective then, in December, if I would do that. And he told *874 me, he said, ‘If yon come to Elba, Gene, you’ll have a job with this company as long as you want,’ and we made a little more small talk. As we walked out the door, we walked by the office of Mr. Robbins which was vacant and he said, ‘When I promote you to vice president, this will be your office.’ He said, ‘You’ll answer directly to me’ and that ‘You and I will be running this company together,’ and I thanked him again and told him I was going to discuss it with my wife and I would let him know if I accepted, which I did.”
Donaldson’s business diary from the day of the Elba visit includes the following notation: “Met with J.R.B. Discussed terms of moving to Elba. $5,000 raise now & promised permanent employment as v. pres, when Earl Peters retired in 1989.”
Donaldson moved to Elba in December 1988; he received the $5,000 pay raise and began working in National Security’s home office. Testimony from several witnesses indicated that, at that time, the general belief among National Security employees was that Donaldson was being groomed for the vice president’s position. Two former National Security agents testified that when they began their work at National Security, Donaldson’s career at National Security was used as an example of the career advancement opportunity available at the company. Several interoffice memoranda and letters praising Donaldson’s work were also admitted into evidence.
In January 1989, Peters retired. Donaldson was not made vice president, but in March 1989 National Security hired Richard Girdner as agency director; Girdner’s duties in that position included those that Peters had had as vice president. Donaldson testified that Brunson told him that Girdner would help him in his training to become vice president. At trial, however, Brunson denied having ever discussed with Donaldson the possibility of his attaining the vice president’s position.
In November 1990, Donaldson slipped and fell in a driveway while working with a National Security agent in Troy, Alabama; he later underwent surgery for a hernia stemming from the accident. Donaldson filed for workers’ compensation benefits soon after his injury. National Security, which insured itself for workers’ compensation, paid his medical bills and provided disability pay. However, on March 21, 1991, Donaldson says, Girdner informed him that he was being terminated from his position as regional manager and was being demoted to his Phe-nix City district manager’s position. According to Donaldson, he then went into Brun-son’s office, where he says the following conversation occurred:
“I said, ‘Jack,’ my exact words were, ‘What in the hell is going on?’ I said, ‘Richard just called me in from the field and told me that my job has been terminated,’ and I said, T just want to know what’s going on.’ He made the statement, ‘That’s correct.’ And I said, You mean all these promises that you made to me to move to Elba to learn the workings of this home office and be the next vice president, all of that was just a pack of lies?’ I said, You’re going to do me just like you did Mr. Marvin Robbins,[2] fired him when he was out recuperating from a heart attack,’ and that made him really mad. He jumped up and hit the desk and he said, ‘I’m not going to have anybody hanging around this office acting like they’re hurt,’ and I jumped up and hit the other side of the desk and I told him, I said, ‘I’m not acting, Mr. Brun-son. I’m hurt and you know it.’ And he said, T cannot believe that a home office official would file a Workmen’s Comp claim.’ He said, ‘Don’t you realize what an image that you’re portraying to the field.’ He said, We’ll be flooded with claims where people are slipping down and claiming they’re hurt.’ I said, ‘Mr. Brunson, you know I’m hurt.’ I said, ‘I’ve trusted you, everything you’ve ever told me.... ’ I said, ‘If I elect to leave, are you going to pay me any severance pay? It’s my understanding you paid Mr. Robbins six months.’ He said, ‘Hell no, I’m not going *875 to pay you any severance pay.’ He said, “You can go back as far as I’m concerned to Phenix City and root hog and die poor.’ ”
Brunson admitted having spoken with Donaldson on March 21, 1991, but denied having any knowledge of Donaldson’s workers’ compensation claim at that time. He stated that he told Donaldson that “it was just not working out ... and we felt like he would be happier back in Phenix City.” Both Girdner and Brunson testified that Donaldson was demoted because of unsatisfactory work performance. Donaldson moved back to Phenix City in April 1991; he worked in the district manager’s position until July 1991, when he resigned and obtained a position with another insurance company. National Security agreed to pay Donaldson $500 a week plus travel expenses during an initial seven-week period following the demotion. However, Donaldson’s loss of his regional manager’s position would have resulted in a pay cut from his previous weekly salary of $610 to $275, which was less than Donaldson’s last salary as district manager in 1987, which had been $850 weekly. Donaldson also lost the use of a car and credit cards provided by National Security.

The Retaliatory Discharge Claim

On appeal, National Security and Brunson first argue that Donaldson was not “terminated,” within the meaning of Ala. Code 1975, § 25-5-11.1. They also assert that Donaldson failed to present sufficient evidence to demonstrate that his demotion to district manager was due to his filing of the workers’ compensation claim.
Alabama’s workers’ compensation laws are liberally construed by this Court in favor of the employee, in order to effectuate the beneficent purposes of the laws. Section 25-5-11.1 provides, in pertinent part:
“No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers’ compensation benefits under this chapter....”
This Court has interpreted § 25-5-11.1 to prohibit the constructive termination of an employee because of his filing an action to recover workers’ compensation benefits. Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364 (Ala.1988). In Irons v. Service Merchandise Co., 611 So.2d 294 (Ala. 1992), we defined “constructive discharge” as follows:
“ ‘[I]f the employer deliberately makes an employee’s working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has [brought about] a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.’ ”
Irons, 611 So.2d at 294, 295, quoting Jurgens v. EEOC, 903 F.2d 386, 390 (5th Cir.1990).
In White v. Midtown Restaurant Corp., 632 So.2d 1330 (Ala.1994), the Court held that a mere demotion from one position to another was not a termination within the meaning of § 25-5-11.1. However, in White, the defendant employer did not reduce the demoted employee’s salary, and the employee’s working conditions following the demotion did not force the employee to resign from that position.
We hold that the conflicting evidence regarding the circumstances of Donaldson’s demotion and ultimate resignation created a factual question for the jury as to whether Donaldson was “terminated,” as that term is used in § 25-5-11.1. As noted above, evidence indicated that Donaldson’s demotion to the district manager’s position that he had previously held brought with it a substantial salary reduction, the loss of the use of a company car and credit cards, and a move from Elba back to Phenix City. Thus, the facts of this case distinguish it from White, supra. Under these circumstances, the jury could have found that National Security created conditions so intolerable as to force Donaldson to resign his position. Therefore, the evidence was sufficient to support a finding of a constructive discharge, which is a termination within the purview § 25-5-11.1. Irons, supra.
We further hold that from the evidence presented at trial the jury could have found that National Security and Brunson’s reasons for demoting Donaldson were pretextual and that Donaldson’s demotion was due to his *876 filing the workers’ compensation claim. National Security and Brunson submitted testimony from Girdner and Brunson to the effect that Donaldson was demoted from regional manager because of the lack of growth and sales in his region, personnel problems, and other reasons. However, Donaldson’s testimony, if believed, indicates that the demotion was due to concern for the example Donaldson was setting for his fellow National Security employees — concern that a “home office official” fifing a workers’ compensation claim would cause National Security to be inundated with similar claims from its agents. Under the circumstances of this case, the trial court properly submitted Donaldson’s retaliatory discharge claim to the jury. Twilley v. Daubert Coated Products, supra; Culbreth v. Woodham Plumbing Co., 599 So.2d 1120 (Ala.1992); Lozier Corp. v. Gray, 624 So.2d 1034 (Ala.1998).

The Fraud Claim

National Security and Brunson next contend that the trial court erred in submitting a portion of Donaldson’s fraud claim to the jury. We agree.
In ordinary cases of alleged fraud, the plaintiff must prove that the defendant made a false representation of a material fact and that the plaintiff relied upon the false representation to his detriment. Harmon v. Motors Ins. Corp., 493 So.2d 1370 (Ala.1986). In many cases, a defendant’s recklessness in making a false representation is sufficient to support a fraud claim; the actual intention to defraud is often not needed. Salter v. Alfa Ins. Co., 561 So.2d 1050 (Ala.1990). However, the law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future. In those “promissory fraud” actions, the plaintiff must prove that, at the time the representation was made, the defendant had an intention not to perform the act promised and had an intention to deceive the plaintiff. Valley Properties, Inc. v. Strahan, 565 So.2d 571 (Ala.1990); Kennedy Elec. Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983); D.H. Holmes Dep’t Store v. Feil, 472 So.2d 1001 (Ala.1985).
The question of the defendant’s intention in making the alleged representation is ordinarily a question of fact for the jury. Martin v. American Medical Intern., Inc., 516 So.2d 640 (Ala.1987). However, the plaintiff must show more than that the defendant failed to fulfill the promised act; otherwise, as has been often noted by this Court, a typical breach of contract claim would invariably contain a fraud claim as well. This Court has further stated:
“Unless a plaintiff puts forth some proof that there was something more than a failure to perform, something upon which a jury could infer that at the time the promise was made the defendant had no intention of performing, it is error to submit a fraud claim to the jury.”
Russellville Production Credit Ass’n v. Frost, 484 So.2d 1084, 1087 (Ala.1986); see also Old Southern Life Ins. Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976).
The facts of this case clearly establish that Brunson’s alleged misrepresentations — that Donaldson would be promoted to vice president after the previous vice president, Peters, retired, and that Donaldson would have permanent employment with National Security — are promises of acts to be performed in the future. Therefore, because these are allegations of promissory fraud, Donaldson had the burden to produce evidence to show that Brunson had a deceitful intention not to perform those actions. See, e.g., Russellville Production Credit Ass’n v. Frost, 484 So.2d 1084; Harrell v. Arrington, 595 So.2d 1356 (Ala.1992). Viewing the evidence most favorably to Donaldson, we find no evidence to suggest that, if Brunson made the alleged statement regarding Donaldson’s promotion to vice president, he made that statement with the present intent not to perform and with the intent to deceive. Although we recognize that “ ‘[i]ntent is an act or emotion of the mind seldom, if ever, capable of direct proof,’ ” Old Southern Life Ins. Co. v. Woodall, 295 Ala. at 240, 326 So.2d at 729, there was no evidence submitted from which the jury could infer that, at the time the alleged misrepresentation was made, Brunson intended to deceive Donaldson and *877 intended not to make him vice president. Indeed, Donaldson’s excellent work record during the period when Brunson allegedly made the misrepresentations could support a finding that, at that time, he had intended to promote Donaldson to vice president, but later failed to do so. While this could be considered a reckless misrepresentation, recklessness alone is not enough to support a fraud claim of this sort. Kennedy Electric Co. v. Moore-Handley, Inc., supra; Russell-ville Production Credit Ass’n, supra. For these reasons, National Security and Brunson were entitled to a directed verdict on Donaldson’s fraud claim relating to the alleged misrepresentation about making Donaldson vice president.
If a defendant moves for a directed verdict as to a claim that is not supported by the evidence and the trial court denies that motion, and the jury then returns a general verdict, that verdict will not be presumed to have been returned on a claim that was supported by the evidence. John Deere Indus. Equipment Co. v. Keller, 431 So.2d 1155 (Ala.1983); Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Although the trial court properly allowed the jury to consider the evidence as it related to Donaldson’s retaliatory discharge claim, it erred in denying National Security and Brunson’s motion for a directed verdict as to Donaldson’s fraud claim relating to the alleged misrepresentation about making Donaldson vice president. Because the jury returned a general verdict, we cannot presume that the jury returned its verdict on Donaldson’s retaliatory discharge claim. Therefore, the judgment of the trial court must be reversed and the cause remanded for a new trial as to Donaldson’s retaliatory discharge claim.
REVERSED AND REMANDED.
ALMON, SHORES, HOUSTON, and BUTTS, JJ., concur.

. The trial court directed a verdict for National Security against Donaldson’s claim alleging fraud in the alleged statement regarding permanent employment; that portion of the fraud claim is not at issue in this appeal.

. Marvin Robbins was a previous vice president of National Security; his job was terminated in 1986. The record indicates that Robbins sued National Security, alleging retaliatory discharge, and obtained a judgment based upon a jury verdict.