This case involves a dispute over hunting *Page 247 
rights.[1]
 I. FACTS
In March 1993, Tensaw Land and Timber Company ("Tensaw") executed an agreement, designated as a "hunting lease," with Richard A. Boykin, Sr. ("hunter Boykin"), to approximately 2,100 acres in Clarke County, Alabama. The agreement provided, among other things, that hunter Boykin and his licensees and invitees had the right "to enter upon the lands owned by Lessor and hereby leased to Lessee"; that they had the right to hunt or fish on the leased property; that they would not commit any act that would be or would become hazardous to the growing of timber; that they would comply with all state laws; that they would not construct any plantings, food plots, roads, structures, etc., without the written consent of the owner; that they would keep the property clean; that they would keep all gates closed and locked; and that, if requested, they would post the land with black-on-yellow signs containing the names of the owner and the hunter. The agreement provided for annual rent, beginning at $840.00 per year. The agreement was for hunter Boykin's lifetime, subject to cancellation by the hunter upon 15-days' notice, and by the owner "only upon breach thereof by Lessee which is not corrected by Lessee within ten (10) days after written notice thereof by Lessor" and upon other conditions not pertinent herein.
Hunter Boykin was forest manager for a paper company in Mississippi and Alabama, managing 189,000 acres of land from 1955 to 1969. He was president of Tensaw from 1955 to 1974. At the time of trial, he said, he was "developing some property [in Indiana]."
The agreement resulted from a settlement between Tensaw and hunter Boykin, whereby hunter Boykin gave up hunting rights to 27,000 acres and a $40,000 hunting lodge in consideration of $75,000 and Tensaw's execution of the agreement. In addition, the John G. Boykin Trust and the Richard A. Boykin Trust received approximately $40 million in assets, of which hunter Boykin was the grantor. Apparently, in 1983 the Richard A. Boykin and John G. Boykin Trusts became the owners of this property.
In 1983, hunter Boykin transferred the hunting rights to the Wing Tract Hunting Club. After the hunting club ceased to exist, Lee Boykin, as an individual, rented the hunting rights from his father, hunter Boykin, for several years, at $4,000 or $5,000 per year. Lee Boykin's right to hunt on the land was terminated in September 1991 when he received notice that hunter Boykin was going to lease the hunting rights to someone else.
In September 1991, hunter Boykin executed what was called a "hunting lease," with Jesse Gilliam, who entered the property under this "sublease" agreement shortly before the dispute at issue here arose. Hunter Boykin and Gilliam are referred to collectively as "the hunters." Gilliam agreed to pay rent of $10,000 per year. The "sublease" agreement stated that Gilliam had "the exclusive right and privilege of propagating, protecting, hunting, shooting and taking game and wildfowl . . . together with full rights in Lessee to enter into, upon, over, across and out of said lands solely for purposes above described and for none other whatsoever." The "sublease" agreement recited that it was subject to the terms and conditions of the agreement between Tensaw and hunter Boykin, and that Gilliam was familiar with the terms and conditions of that agreement.
 Notice of Breach
The owners (the John G. Boykin and Richard A. Boykin Trusts), at that time, notified hunter Boykin on November 21, 1991, that Gilliam had committed the following violations of the hunting lease:
 "1. The 1991 annual rental in the sum of $945.00, which was due on or before July 1, 1991, has not been paid.
 "2. A new food plot has been created on the power line without the prior written consent of the Trusts in violation of paragraph 1F of the lease. *Page 248 
 "3. The lock on the gate has been changed and the Trusts have not been furnished with a key in violation of paragraph 1H of the lease.
 "4. The land has not been posted in accordance with paragraphs 1I and 1J of the lease.
 "5. The Trusts have not been furnished with proof of insurance as required by paragraph 2 of the lease.
 "6. Certain tree stands have been moved or destroyed, and although this is not expressly prohibited by the lease, these stands clearly are the property of the Trusts."
The owners issued the following demand:
 "[T]hat these violations be corrected within ten days following receipt of this letter. If the violations are not cured within that time, the Trusts will consider the hunting lease terminated, and will proceed to take whatever steps are necessary to regain possession of the Wing Tract."
Hunter Boykin responded on November 27, 1991:
 "Dick had simply overlooked the payment of the lease. I am enclosing herewith a check payable to the two Trusts in the amount of $945.00.
 "Concerning the new food plot, it has been built in the power line and no trees were disturbed to build it. It is on the easement in favor of Alabama Power Company and not on Trust lands as such. Because no timber was damaged to build it, I can not imagine that the Trusts would be able to object to the food plot even if their consent was required. We have advised the Lessee to be sure that before any new food plots are built other than on the power line, he should obtain prior written consent of the Trusts and he has assured us that he will do that.
 "I am enclosing herewith a copy of the key to the lock on the gate.
 "The lease provides that the land is to be posted 'if requested.' Since we have been requested to post it, for whatever reason, we will do so. Hubert Bolling has been instructed to post the property this week. If you are not satisfied with the manner in which he posts it, please let us know.
 "I am enclosing herewith a copy of the Declaration page on the liability insurance policy issued by Audubon Indemnity through the Alabama Wildlife Federation.
 "Concerning the tree stands, we have been assured by our Lessee that he did not move or destroy any tree stands. He tells me that Lee removed one tree stand, but other than that we do not know about any tree stands which have been moved or destroyed and neither Dick nor his lessee has been responsible for any tree stands being moved or destroyed."
The hunters never received a complaint from the owners that the posting was not acceptable.
 Posting
Lee Boykin stated that the property was not posted by Gilliam until the fall of 1992 and that during the 1991-92 hunting season, there was a problem with people trespassing and entering the property from the north end. Lee Boykin put up posted signs on the north side of the property after trespassers were caught fishing during the summer of 1992. He said he was on the property cruising and appraising the various tracts almost every week in November and December 1991 and January 1992 and did not see any posted signs on the property.
Gilliam testified that when he received the notice of the violations, he and a member of his hunting club posted the property on Thanksgiving weekend in November 1991 by putting two signs on the front gate and two signs on the back gate. The black and white or black and red signs stated "Posted No Trespassing" and had no one's name on them. In October 1992, Gilliam put up posted signs with black lettering on yellow.
Mr. Hubert Bolling was familiar with the property and had worked it for several paper companies that had owned it previously. He had had the hunting rights on this property for 10 or 12 years and never was required to post it. He said he was thoroughly familiar with the procedure of posting property. He had worked as a forest manager for more than 20 years, had walked and checked land *Page 249 
lines, had owned land of his own, and had posted his own land. In his opinion, to adequately post land against trespassers, one would have to place signs every 100 feet.
Mr. David Chestang, a forestry consultant who is familiar with the property, said he worked around the north side of the property in November and December 1991 and that he did not see any posted signs. In late summer 1992, he observed that the property had been posted along a road frontage. He had caught people fishing on the property before the property was posted in the summer of 1992; he telephoned the game warden, who came and talked to the poachers. Lee Boykin stated that in July 1992 he put up "no trespassing" signs. At the time he placed these signs, the only other signs on the property were at the two gates.
 Food Plots
Gilliam testified that after being told it was a violation of the agreement to plant a food plot, "[he] couldn't do anything about the food plot because it was on Alabama Power's line." He also testified that he planted the plots again the next year after the owners had notified him that they considered the food plots a breach of the agreement. He estimated the number of food plots at probably more than 20.
Lee Boykin explained why he objected to having a food plot under the power line:
 "Q. . . . Is the power line where the food plots were planted on your property?
"A. Yes.
 "Q. In fact, was there anything done about that food plot after Halron's letter to Allen Chason?
 "A. They planted again this past year. It's an invitation for every night hunter in Clarke County to ride by and shoot. It's right on the highway and Buster Prichett has the field behind me and if you are on the highway and shoot in that direction you are shooting straight at Buster and his kids. That's why I don't want it planted.
 "Q. Have they ever obtained written permission from you or the trustees to plant this?
"A. No."
Lee Boykin also stated that because of the manner in which the hunting was done in the fall of 1992, it was unsafe to hunt on the land.
Gilliam filed a civil action alleging tortious interference with his hunting rights and requested a preliminary injunction prohibiting the owners from interfering with those rights. Immediately thereafter, the owners filed a civil action against the hunters, requesting a judgment declaring that the hunters had breached the agreement and that the "hunting lease" was invalid. They also requested a preliminary injunction prohibiting the hunters from entering on the property. After these civil actions were filed and before trial, Lee Boykin became the owner. These two civil actions were consolidated for trial.
The trial court held that the hunters' failure to properly post the property, as well as their dumping garbage, building tree stands, and planting food plots were not breaches of the lease, and that, therefore, the lease was valid. The trial court also upheld the hunters' rights under the "lease" on other grounds that we need not address here.
 II. DISCUSSION
Our initial inquiry concerns the nature of the right hunter Boykin acquired from Tensaw. The original agreement, termed a "Hunting Lease," provided
 "[t]hat Tensaw Land Timber Company, Inc. does hereby grant to said Richard A. Boykin the right, during and for a period expiring on his death, to enter upon the lands owned by Lessor and hereby leased to Lessee, . . . to hunt and fish on said property."
The fact that the agreement is entitled "Hunting Lease" is not dispositive if in fact the instrument shows that the parties created something other than a lease. See Baseball PublishingCo. v. Bruton, 302 Mass. 54, 18 N.E.2d 362 (1938) (wherein the court held that an instrument entitled "lease" did not create a lease, but rather an easement in gross of five years' duration). *Page 250 
In Reeves v. Alabama Land Locators, Inc., 514 So.2d 917, 918
(Ala. 1987), the Alabama Supreme Court observed:
 "The right to hunt upon the land of another is a profit à prendre. Jones v. Davis, 477 So.2d 285 (Ala. 1985). See also Thompson on Real Property, §§ 135 to 140 (1980). The 'profit à prendre,' which derives its name from the French, means 'profits to take,' the phrase 'from land' being implied. A profit à prendre is a right exercised by one man in the soil of another, accompanied with participation in the profits of the soil, or a right to take a part of the soil or of the produce of the land. Thompson on Real Property."
The observation by the Reeves court that hunting rights are profits à prendre, however, may be limited to a grant of those rights by deed. See Fairbrother v. Adams, 135 Vt. 428,430, 378 A.2d 102, 104 (1977) ("the granting of hunting and fishing rights by a deed conveyance creates a profit àprendre, which is an interest in land").
Professor Thompson's treatise, cited by our Supreme Court inReeves, notes that "[t]he documents which create profitsà prendre are frequently called leases by the parties." 8 Thompson on Real Property, § 65.06(b) at 62 (Thomas ed. 1994). That treatise further observes:
 "Many such arrangements will be for a term of years. . . . When considered along with the title of the document, the fact that the duration is measured in years sometimes results in an effort to characterize the relationship as landlord/tenant and an attempt to apply rules from that area. Such efforts are, quite obviously, mistaken. The relationship created by such a document does not extend the general possessory right that is a part of the landlord/tenant relationship. It gives only a right of access to land for the purpose of removing the designated substance and leaves the landowner's general right of possession undisturbed, except to the extent necessary to accomplish that purpose."
Id. at 62-63.
The treatise concludes that "the substantive rules governing the profit à prendre relationship are generally the same as those governing easements." 8 Thompson on Real Property, § 65.06(a) at 61. See also Gerhard v. Stephens, 68 Cal.2d 864,877, 442 P.2d 692, 704, 69 Cal.Rptr. 612, 624 (1968) ("[a]profit à prendre [is] an incorporeal hereditament. . . . essentially indistinguishable from [an] easement").
 "The term 'easement' connotes an incorporeal right 'imposed on corporeal property.' Louis Pizitz Dry Goods Co. v. Penney, 241 Ala. 602, 605, 4 So.2d 167, 169 (1941). 'An easement, although an incorporeal right, . . . is yet properly denominated an interest in land, . . . and the expression 'estate or interest in lands' is broad enough to include such rights; for an easement must be an interest in or over the soil. Oates v. Town of Headland, 154 Ala. 503, 505, 45 So. 910, 911
(1908) (quoting 14 Cyc. 1139, nn. 6 and 7)."
West Town Plaza Associates v. Wal-Mart Stores, Inc.,619 So.2d 1290, 1295 (Ala. 1993). In Alabama, an easement is an interest running with the land; it "can be created in only three ways: by deed; by prescription; or by adverse use for the statutory period." Camp v. Milam, 291 Ala. 12, 17, 277 So.2d 95, 98
(1973).
Neither prescriptive nor adverse use is at issue here, and the agreement between Tensaw and hunter Boykin is not a deed, as it granted only the right "to enter upon the lands." Here, as in Louisville N. R.R. v. M/V Bayou Lacombe, 597 F.2d 469
(5th Cir. 1979), a case in which the Fifth Circuit Court of Appeals construed a writing as a contract and not as a conveyance of real property, "[t]here is no language purporting to convey an interest in real property, the [user of the property] pays a . . . rental, and the right [of use] is terminable . . . at the will of both parties upon notice." 597 F.2d at 473.
In Southern Ry. v. Louisville N. R.R., 241 Ala. 691, 698,4 So.2d 400, 406 (1941), the Alabama Supreme Court, commenting on the grant by one railway company to another railway company of the right to use its bridge, stated the following: "While the right it confers may not be, strictly speaking, an easement, it is a right of user in the nature of an easement, and the agreed rent and the obligation to contribute to upkeep is based on theright of user." (Emphasis in original.) *Page 251 
The right acquired under the agreement in this case, though not an easement or a profit à prendre, is in the nature of
such rights, because it is based on use of the land rather than possession of the land.
In Holt v. City of Montgomery, 212 Ala. 235, 102 So. 49
(1924), the owner of a gravel pit agreed to sell the City all the gravel it needed, and it granted the City the right to enter its land to remove the gravel. At issue was whether the agreement between the gravel pit owner and the City was a lease or a license. Holding that the agreement granted a "license with an interest," the Alabama Supreme Court distinguished between leases and licenses as follows:
 "Licenses are often granted upon such terms and conditions and upon such considerations which ally them so closely to leases, that it is frequently difficult to distinguish between them. A mere license, as that term is generally used, is revocable at pleasure . . ., but when coupled with an interest, may lose the quality of revocability. . . .
". . . .
 "The distinction between a lease and a license appears to be very well stated in a quotation found in Stinson v. Hardy, 27 Or. 584, 41 P. 116, [(1895)], as follows:
 " 'A lease is a contract for the possession of land by the lessee, and . . . is a grant of an estate in the land. * * * A license is an authority to do some act or series of acts on the land of another, for the benefit of the licensee, without passing any estate in the land. . . .'
". . . .
 "One of the principal tests in determining whether . . . the contract is to be interpreted as a lease or a license is whether or not it gives exclusive possession of the premises against all the world, including the owner, in which case a lease is intended, or whether it merely confers a privilege to occupy under the owner, thereby indicating a license."
Holt, 212 Ala. at 237, 102 So. at 50-51 (citations omitted).
The original agreement in this case gave hunter Boykin only the right "to enter upon the lands" for the purpose of hunting and fishing. It clearly did not grant him "exclusive possession of the premises against all the world, including the owner."Id. The fact that the term of the "hunting lease" was for the life of hunter Boykin supports the conclusion that the right granted was a personal one and not one that ran with the land. We conclude, as the court in Bayou Lacombe did, that the right acquired by hunter Boykin under the "hunting lease" was "a personal right created by contract and not an interest which attaches to or runs with the land." Bayou Lacombe, 597 F.2d at 473 (citing Camp, supra). Based on the reasoning of Holt v.City of Montgomery, we hold that the right was a license coupled with an interest. See also Steward v. St. Regis PaperCo., 484 F. Supp. 992 (S.D.Ala. 1979); Camp, supra. See generally 8 Thompson on Real Property §§ 64.01 et seq. (Thomas ed. 1994). "A license coupled with an interest is an interest in personalty, and so cannot be described as a lease." Stewardv. St. Regis Paper Co., 484 F. Supp. at 999.
The substantive rules governing licenses are the same as those governing contracts. See Lake Martin/Alabama PowerLicensee Ass'n, Inc. v. Alabama Power Co., 601 So.2d 942 (Ala. 1992). Therefore, contract principles apply in this case.
 Standard of Review
In Johnson v. Jagermoore-Estes Properties, 456 So.2d 1072,1075 (Ala. 1984), the Alabama Supreme Court observed:
 "It is well-settled that the question of whether fraud or a breach of contract has occurred is to be determined by the trier of fact, John Deere Industrial Equipment Co. v. Keller, 431 So.2d 1155
(Ala. 1983), and that where, as here, the trial court sits as the trier of fact, its findings are entitled to a presumption of correctness and will be disturbed on appeal only if palpably wrong, unsupported by the evidence, or manifestly unjust. General Electric Credit Corp. v. Strickland Division of Rebel Lumber Co., 437 So.2d 1240 (Ala. 1983)." *Page 252 
 Breach of Agreement
Before discussing the issues of the hunters' failure to properly post, the hunters' planting of food plots without written permission, and the consideration paid by hunter Boykin, we define "breach of contract":
 " 'Breach' consists of the failure without legal excuse to perform any promise forming the whole or part of the contract. 17 Am.Jr.2d Contracts § 441 at 897. Where the defendant has agreed under the contract to do a particular thing, there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do. 17 Am.Jur.2d, supra."
Seybold v. Magnolia Land Co., 376 So.2d 1083, 1085 (Ala. 1979).
In Oates v. Lee, 222 Ala. 506, 507, 133 So. 44 (Ala. 1931), the Alabama Supreme Court observed:
 "It is not the province of the court to make contracts for the parties, but its duty is confined to the interpretation of the one which they have made for themselves without regard to its wisdom or folly. As said by this court in Union Cent. Relief Ass'n v. Thomas, 213 Ala. 666, 106 So. 133, 134 [(1925)]: 'We do not understand why parties in their right mind should enter into such contracts; but these parties did, the court has no authority to make a contract for them, and the contract, lawful in its provisions though it may be considered improvident on the part of plaintiff, must be given effect, if at all, according to its plain and inescapable meaning.' And Union Central Relief Ass'n v. Johnson, 198 Ala. [488] 491, 73 So. 816, 817 [(1916)]: 'Where the language is unambiguous, and but one reasonable construction of the contract is possible, the court must expound it as it is made by the parties.' Like expressions are found stated in the authorities generally. 13 Corpus Juris, 525 and 541-542.
 "It is argued that the enforcement of such a provision is harsh and unconscionable, and that such results are to be avoided. But the authorities relied upon by plaintiff relate to contracts that are ambiguous and call for interpretation by the courts, and it is well recognized that, if a contract is susceptible of two constructions, unconscionable results are to be avoided, and that the irrational and unreasonable was not the contractual intent. Birmingham Waterworks v. Windham 190 Ala. 634, 67 So. 424 [(1914)]; Lowery v. May, 213 Ala. 66, 104 So. 5 [(1925)]; Patterson v. A.C.L.R.R. Co., 202 Ala. 583, 81 So. 85 [(1919)].
 "We may properly confess a decided sympathetic leaning to plaintiff's cause, for, as appears from the facts here presented, the enforcement of the letter of the contract results in a hardship entirely out of harmony with our sense of fair play, for it is clear defendant received the full benefits of plaintiff's labor. True the amount is small, but 'the laborer is worthy of his hire.' However, the contract is lawful, and the parties fully capable of contracting with no pretense there was any fraud or misrepresentations in its execution. Its language is plain and unambiguous. There is nothing for the court to construe. Under such circumstances the contract is to be enforced, however onerous it may be. 13 Corpus Juris. 542."
(Emphasis added.)
Based on these authorities, we must determine whether the trial court's finding that there was no breach was palpably wrong, unsupported by the evidence, or manifestly unjust.
 a. Posting
Ala. Code 1975, § 13A-7-1(4), provides that
 "[a] person who enters or remains upon unimproved and apparently unused land, which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders, does so with license and privileges unless notice against trespass is personally communicated to him by the owner of such land or other authorized person, or unless such notice is given by posting in a conspicuous manner."
(Emphasis added.)
The commentary to this section states:
 "The provision relative to entering unenclosed, unimproved land is designed to exclude from criminal trespass in the third *Page 253 
degree a person who enters upon, e.g., wild forest land, when there is no indication of apparent prohibition against intrusion. Such technical civil trespassing does not call for criminal sanctions. If the owner wishes the support of the criminal law, he should 'post' the land in a conspicuous manner."
(Emphasis added.)
Section 13A-7-4(a) states: "A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises." The commentary to § 13A-7-1 states that in order to "[k]nowingly" enter or remain unlawfully, an intruder must be aware of the fact that he has no license or privilege to enter or remain. Here, the premises consisted of approximately 2,100 acres of woodlands, and placing two signs at two gates certainly does not constitute posting "in a conspicuous manner." Instead, placing "no trespassing" signs every 100 feet apart so that an outsider could read one sign from the other sign would, in the particular circumstance of this case, constitute placing notices "in a conspicuous manner." Only then could one who entered the property, other than at the gates, have notice and be guilty of criminal trespass in the third degree.
Clearly, the object of the parties to this contract was to ensure the free, lawful, and safe exercise of hunting rights on the property. The evidence is undisputed that, upon receiving notice to post the property, the hunters, within the 10 days provided in the agreement, posted only two signs at two gates to a 2100-acre tract. The evidence established that the hunters' perfunctory attempt at posting the property was ineffective and contrary to the interest of both the owners and the hunters. The hunters' rights could be diminished, and the owners' responsibilities increased, if the property were invaded by trespassers and poachers. The hunters' request to be notified if this posting was not acceptable to the owners is not a legal excuse for not properly posting, because the hunters were in default if they did not properly post within 10 days.
We conclude that the hunters' failure to post was a breach of the agreement and that the trial court's finding was "unsupported by the evidence" and "palpably wrong."
 b. Food Plots
Gilliam's justification for planting probably more than 20 food plots was that they were planted on power line rights-of-way that had been cleared and his assertion that such planting did not disturb the owner's timber. He produced no evidence that he had permission from the power company to use its rights-of-way, so the only "right" to use the land had to be granted through the agreement, which specifically prohibited the planting of food plots. The owner was certainly justified in being concerned about the safety of persons near a specific hunting spot.[2] Although the owner testified to a valid safety reason for enforcing the provision against planting food plots, it was not necessary that the owner have such a reason, as the mere planting of the plots, under these circumstances, was a clear breach of the contract. Gilliam's lease stated that he was familiar with the terms of the "lease" between Tensaw and hunter Boykin.
The agreement placed the prohibitions against damaging timber and planting food plots in separate subparagraphs. The prohibition against "any act which will be or become hazardous to the growing of timber" is found on page 2 in paragraph 1(B). The prohibition against "construct[ing] or install[ing] upon said lands any plantings, food plots," is found on page 3, paragraph 1(F). Therefore, the hunters' reasoning that the planting of food plots on cleared rights-of-way was not prohibited by the terms of the agreement because no timber was damaged is not supported by a reasonable interpretation of these two separate provisions.
The evidence is undisputed that, upon receiving notice that the owners considered the food plots a violation of the agreement, the hunters failed to destroy the food plots within *Page 254 
the 10 days provided in the agreement. Further, the food plots were planted the following year. The judgment of the trial court, that planting of the food plots did not constitute a breach, is "palpably wrong and manifestly unjust" because that judgment would leave the owner with no remedy to enforce this specific provision in the contract.
 c. Consideration
The hunters argue that it would be unconscionable to allow a forfeiture of the agreement, because of substantial consideration paid by hunter Boykin. Because the original agreement was a license and not a lease, the policy against "forfeiture" of a lease does not apply here. There was no testimony as to the value of the agreement at the time of its execution.
The trial court's finding that, because of the consideration paid by hunter Boykin, the agreement was not breached is not supported by the evidence.
The judgment of the trial court is reversed, and the cause is remanded for proceedings consistent with the principles stated in this opinion.
REVERSED AND REMANDED.
THIGPEN, YATES, and MONROE, JJ., concur.
ROBERTSON, P.J., concurs in the result.
[1] This case was transferred to this court by the Supreme Court pursuant to Ala. Code 1975, § 12-2-7.
[2] See Clark v. State, 591 So.2d 23 (Ala. 1991), involving the death of a young hunter killed in Clarke County in January 1990.